**Kevin WIGGINS**

v.

**Thomas R. CORCORAN, Warden William Sondervan, Commissioner of Corrections J. Joseph Curran, Jr., Attorney General, State of Maryland**

**No. JFM–99–2420.**

United States District Court, D. Maryland.

Sept. 19, 2001.

Donald B. Verrilli, Jr., Washington, DC, for Kevin Wiggins.

Ann N. Bosse, J. Joseph Curran, Jr., Office of Atty. Gen., Baltimore, MD, for Thomas R. Corcoran, William Sondervan, J. Joseph Curran, Jr.

## OPINION

MOTZ, District Judge.

More than twelve years ago, the body of seventy-seven year old Florence Lacs was found in the bathtub of her garden apartment. The medical examiner determined the manner of death was homicide caused by drowning. Her car and credit cards were missing but later recovered in the possession of Kevin Wiggins.

Now before this Court is a petition for writ of habeas corpus brought under 28 U.S.C. § 2254 by Wiggins,[1] who was sentenced to death by a jury after having been found guilty of the murder of Mrs. Lacs by the Honorable J. William Hinkle in a non-jury trial. Wiggins asserts, *inter alia*, that the evidence was constitutionally insufficient to sustain his conviction and that his trial counsel was constitutionally ineffective in failing to present mitigation evidence during his sentencing proceeding. Both claims have been exhausted, and both are meritorious.[2] Therefore, Wiggins's petition will be granted.

## I. *History of the Case*

On October 20, 1988, Wiggins was indicted in the Circuit Court for Baltimore County on charges of first degree murder, robbery, theft and burglary. (*See* Paper No. 3, Exhibit 2 at 1). On December 8, 1998, the State filed notice of intention to seek the death penalty. (*Id.*, Exhibit 1 at 2). Wiggins, who opted to be tried before a judge, was represented at trial and sentencing by Michelle Nethercott and Carl Schlaich. On August 4, 1989, Judge Hinkel found Wiggins guilty of first degree murder, robbery, and two counts of theft. (*Id.*, Exhibit 1 at 7–9 and Exhibit 6 at 135–140).

Wiggins elected to be sentenced by a jury. (*Id.*, Exhibit 1 at 12–13 and Exhibit 7 at 142–59). After four days of proceedings, a jury determined that he was a principal in the first degree murder of Mrs. Lacs, and that the appropriate penalty was death. (*Id.*, Exhibit 1 at 1 and 13 and Exhibit 12 at 66–69). Accordingly, on October 18, 1989, Judge Hinkel noted the jury's verdict and also imposed a ten year term of incarceration for robbery and concurrent eighteen month sentences for the two theft convictions. (*Id.*, Exhibit 1 at 9 and 13 and Exhibit 12 at 71–72). Those

1. Questions concerning the need for expansion of the record and an evidentiary hearing, briefed by counsel in additional submissions, have been resolved. *See* Paper Nos. 18 and 19.

2. The merits of the remaining issues raised in the petition, presented by the parties in submissions docketed as Paper Nos. 1, 3, 5, 7 and 9, are addressed herein.

sentences have now been fully served. A motion for new trial was subsequently heard and denied. (*Id.*, Exhibit 1 at 14 and Exhibit 13).

Wiggins, through counsel,[3] argued on direct appeal to the Maryland Court of Appeals that

(1) the evidence presented at trial was insufficient to establish that he perpetrated the crimes;

(2) the trial court erred in denying his motion for new trial;

(3) the evidence presented at sentencing was insufficient to support a finding that he was a principal in the first degree;

(4) the trial court erred in excluding mitigating evidence that the State had made a plea offer of a life sentence;

(5) the trial court erred in excluding other mitigating evidence at sentencing;

(6) the trial court erred in denying petitioner's right of allocution;

(7) the trial court erred in denying his motion for a bifurcated sentencing hearing;

(8) the trial court erred in admitting irrelevant evidence relating to the victim's *TV Guide* magazines;

(9) the trial court erred in admitting victim impact evidence at sentencing;

(10) the death sentence was excessive and disproportionate to the sentences imposed in similar cases, considering the nature of the crime and the defendant;

(11) the Maryland death penalty statute is unconstitutional; and

(12) the trial court erred in imposing separate sentences for the two theft convictions.

(*Id.*, Exhibit 15 at 2–3). In a reported opinion dated November 8, 1991, the appellate court affirmed all but the theft-related counts of the judgment against him. (*Id.*, Exhibit 26); *see also Wiggins v. State*, 324 Md. 551, 597 A.2d 1359 (Md. 1991). Wiggins sought *certiorari* as to one issue, to wit

"[w]hether the exclusion of relevant mitigating evidence at petitioner's capital sentencing proceeding that the state had offered a life sentence in exchange for a plea of guilty and that the death penalty is imposed infrequently in Maryland in like cases violated the Eighth and Fourteenth Amendments."

(*Id.*, Exhibit 27 at iii). On April 27, 1992 the United States Supreme Court denied review. (*Id.*, Exhibit 29); *see also Wiggins v. State*, 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992).

In January, 1993, Wiggins sought post conviction relief in the Baltimore County Circuit Court, raising 38 claims embodying 52 issues. After a hearing, the Honorable John F. Fader II denied relief on all grounds in a 257-page decision filed on October 22, 1997. (*Id.*, Exhibit 1 at 19 and Exhibit 40). In his petition for leave to appeal filed before the Court of Appeals, Wiggins alleged that:

(1) trial counsel provided ineffective assistance at sentencing by failing to investigate and introduce mitigating evidence concerning his traumatic background and mental problems;

(2) trial counsel provided ineffective assistance at the guilt/innocence phase of trial by failing to adduce evidence of the medical examiner's prior inconsistent opinion regarding time of death;

(3) trial counsel provided ineffective assistance by failing to secure a forensic

---

**3.** On direct appeal, Wiggins was represented by Julia Doyle Bernhardt and Melissa Moore.

expert for trial, thus handing him the choice of going to trial without a jury or proceeding before a jury without an expert;

(4) trial counsel failed to investigate and develop evidence regarding jury selection procedures in Baltimore County;

(5) the prosecutor failed to disclose an agreement with one of its witnesses regarding lenient treatment in exchange for testimony; and

(6) the evidence was insufficient to find him guilty of first degree murder and to establish that he was a first degree principal in the murder.

(*See* Paper No. 3, Exhibits 44–46). Wiggins's request for leave to appeal was denied on February 10, 1999 in a reported opinion. *Wiggins v. State*, 352 Md. 580, 724 A.2d 1 (Md.1999). (*See* Paper No. 3, Exhibit 50). On *certiorari*, petitioner sought review as to whether:

(1) trial counsel in a capital case are under a Sixth Amendment duty to investigate mitigating evidence about a defendant's background and character in advance of making a "tactical" decision not to present such evidence at sentencing, and are likewise under a Sixth Amendment duty to present such mitigating evidence at sentencing if the evidence is in no respect inconsistent with counsel's "tactics" at sentencing;

(2) the Sixth Amendment right to effective assistance of counsel is denied when trial counsel fail to impeach a key state witness at trial with a prior inconsistent statement that reveals the State's theory of the case to be scientifically impossible; and

(3) the Sixth Amendment right to effective assistance of counsel is denied where trial counsel, after objecting to the composition of the sentencing jury, fail to introduce any evidence to

support the objection, and in particulate fail to introduce evidence that would have shown that six out of ten African Americans residing in the jurisdiction were excluded from the jury pool.

(*See* Paper No. 3, Exhibit 51 at i). *Certiorari* was denied. *See Wiggins v. Maryland*, 528 U.S. 832, 120 S.Ct. 90, 145 L.Ed.2d 76 (1999).

In the instant petition, his first in federal court, Wiggins asserts that:

A. he did not knowingly and voluntarily waive his right to a jury trial;

B. the evidence was not sufficient to sustain his murder conviction;

C. the trial court erred in denying his motion for new trial;

D. the prosecution failed to disclose exculpatory evidence;

E. counsel at the guilt/innocence phase of trial rendered ineffective assistance;

F. unreliable identification evidence was improperly admitted at trial;

G. the grand jury and sentencing jury were selected in a manner that violated the Sixth Amendment's fair cross-section guarantee and the Fourteenth Amendment's equal protection clause;

H. voir dire of the jurors was inadequate;

I. the trial court wrongly excused prospective jurors;

J. the evidence was insufficient to support the sentencing jury's finding of the aggravating factor of murder committed in the course of a robbery;

K. the evidence was insufficient to support the sentencing jury's finding that he was a principal in the first degree;

L. the court at sentencing erred in several of its evidentiary rulings;

M. the court erred in instructing the jury;

N. counsel at sentencing rendered ineffective assistance;

O. it is unconstitutional to impose capital punishment on a mentally retarded individual;

P. application of the death penalty in Maryland is arbitrary;

Q. the death penalty is excessive punishment in all cases; and

R. counsel on direct appeal rendered ineffective assistance.

(*See* Paper No. 1 at 11–37).

## II. *Threshold Considerations*

### Statute of Limitations

Respondents do not contend—and the Court does not find—that the petition is time-barred pursuant to 28 U.S.C. § 2244(d).

### Exhaustion of State Remedies and Procedural Default

 Before a petitioner may seek habeas relief in federal court, he must exhaust each claim presented to the federal court by pursuing remedies available in state court.[4] *See Rose v. Lundy*, 455 U.S. 509, 521, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); 28 U.S.C. § 2254(b) and (c). In Maryland, this may be accomplished by raising certain claims on direct appeal and with other claims by way of a post conviction proceedings. Exhaustion is not required if at the time a federal habeas corpus petition is filed the petitioner has no available state remedy. *Teague v. Lane*, 489 U.S. 288, 297–98, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Bassette v. Thompson*, 915 F.2d 932, 937 (4th Cir. 1990).

 Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post conviction proceedings or on direct appeal or by failing to timely note an appeal, the procedural default doctrine applies.[5] *Coleman v. Thompson*, 501 U.S. 722, 749–50, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), *reh'g denied* 501 U.S. 1277, 112 S.Ct. 27, 115 L.Ed.2d 1109 (failure to note timely appeal); *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)(failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U.S. 41, 46, 93 S.Ct. 71, 34 L.Ed.2d 194 (1972)(failure to raise claim during post conviction); *Bradley v. Davis*, 551 F.Supp. 479, 481 (D.Md. 1982) (failure to seek leave to appeal denial of post conviction relief).

 Procedural default also may occur where a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir.), *cert. denied*, 526 U.S. 1095, 119 S.Ct. 1517, 143 L.Ed.2d 668 (1999). Maryland's requirement that certain claims be presented on direct appeal, *see*

---

4. The claim must be fairly presented to the state courts. This means presenting both the operative facts and controlling legal principles. *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir.2000) (citations omitted).

5. The procedural default doctrine applies where a state court refuses to consider the merits of a claim on procedural grounds or where procedural grounds would clearly bar consideration of the claim by a state court. *Teague*, 489 U.S. at 297–98, 109 S.Ct. 1060. It does not apply if a state court fails to apply the bar and considers the merits of a claim. *County Court of Ulster v. Allen*, 442 U.S. 140, 154, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

Md. Ann.Code Art. 27, § 645A(c), constitutes an adequate and independent state procedural rule. *Johnson v. Smith,* 981 F.Supp. 944, 948 (D.Md.1997).

■ The procedural default doctrine bar, however, is not absolute. Where a petitioner shows cause and prejudice for such default, or demonstrates actual innocence, federal habeas corpus review may be appropriate, notwithstanding default. *Murray,* 477 U.S. at 495, 106 S.Ct. 2639; *Wainwright v. Sykes,* 433 U.S. 72, 86, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

■ Cause for procedural default must be more than mistake or ignorance. Under some circumstances, ineffective assistance of counsel as determined under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) may be cause.[6] *Edwards v. Carpenter,* 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000). Otherwise, "in order to demonstrate 'cause' for the default [petitioner] must establish that 'some objective factor external to the defense impeded counsel's [or petitioner's] efforts' to raise the claim in state court at the appropriate time." *Breard v. Pruett,* 134 F.3d 615, 620 (4th Cir.1998) (quoting *Murray,* 477 U.S. at 488, 106 S.Ct. 2639). Ignorance of the availability of an appeal in a collateral proceeding, even when based on erroneous legal advice, is not cause for failing to file a timely appeal. *Tower v. Phillips,* 7 F.3d 206, 211 (11th Cir.1993). In addition to showing cause, a petitioner must establish prejudice, i.e., that the errors alleged worked to his actual and substantial disadvantage and were of constitutional magni-

tude. *Carrier,* 477 U.S. at 492, 106 S.Ct. 2639; *Felton v. Barnett,* 912 F.2d 92 (4th Cir.1990); *Waye v. Townley,* 871 F.2d 18 (4th Cir.1989).

■ Even where a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of the petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo,* 513 U.S. 298, 314, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *see also Edwards v. Carpenter,* 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000). The miscarriage of justice standard is directly linked to innocence. *Id.* at 320, 115 S.Ct. 851. Innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted. *Id.* at 315, 115 S.Ct. 851. The miscarriage of justice exception applies where a petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 477 U.S. at 496, 106 S.Ct. 2639. In capital cases, this showing requires a petitioner to show by clear and convincing evidence that but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty. *Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).

■ Here, respondents contend that twelve of the eighteen claims raised in the petition are procedurally defaulted, in whole or in part. (*See* Paper No. 3 at 43–46; 47–49; 52–56; 65–67; 67–69; 70–71;

---

**6.** Ineffective assistance of counsel in proceedings such as post conviction, where representation by counsel is not constitutionally mandated, is not cause for a procedural default. *Coleman,* 501 U.S. at 752, 111 S.Ct. 2546. The fact that certain types of claims may only be raised in post conviction proceedings does

not create a limited constitutional right to counsel in those proceedings which would permit ineffective assistance to constitute cause. *Mackall v. Angelone,* 131 F.3d 442, 449 (4th Cir.1997), *cert. denied,* 522 U.S. 1100, 118 S.Ct. 907, 139 L.Ed.2d 922 (1998).

75–76; 120–121; 144; 145; 146 and 147). Inasmuch as this Court has determined that the evidence was constitutionally insufficient to sustain petitioner's murder conviction and that trial counsel was ineffective in failing to present mitigation evidence at sentencing, the case law cited above mandates federal habeas corpus review of most of the twelve otherwise-defaulted claims, as further elucidated herein. *Murray*, 477 U.S. at 496, 106 S.Ct. 2639.

### III. Standard of Review

Effective April 24, 1996, the Anti–Terrorism and Effective Death Penalty Act of 1996 amended 28 U.S.C. § 2254(d) to provide that:

[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision contrary to, or involved an unreasonable application of, clearly established, federal law as determined by the Supreme Court; or

(2) resulted in a decision based on an unreasonable determination of the facts, in light of the evidence presented in the State court proceedings.

Under the AEDPA, federal courts no longer can correct error in state court proceedings, but must instead exercise a more limited review, set forth in 28 U.S.C. Section 2254(d)(1) and (2)(as amended). The statute provides a new analytical framework for determining whether the state court's findings concerning a claim raised on federal habeas corpus review is correct.

Section 2254(d) now provides that:

[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), the Supreme Court characterized Section 2254(d) as a "new, highly deferential standard for evaluating state court rulings." In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), Justice O'Connor, speaking for the majority, further elucidated that standard, stating that:

Section 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under Section 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by

this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412, 120 S.Ct. 1495. Justice O'Connor indicated that "the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' ...refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Id.* Furthermore, she indicated that:

> [u]nder Section 2254(d)(1)'s "unreasonable application clause...a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

*Id.* at 411, 120 S.Ct. 1495. In other words, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495. A decision is contrary to clearly established federal law if a state court applies a rule that contradicts Supreme Court precedent or if a state court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives

at a [different] result." *Id.* at 405–06, 120 S.Ct. 1495.

"A state court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular ... case ... [qualifies] as a decision 'involving an unreasonable application ... of clearly established Federal law.'" *Id.* at 407–08, 120 S.Ct. 1495. Also, "a state determination may be set aside under this standard if, under clearly established federal law, the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Ramdass v. Angelone,* 530 U.S. 156, 166, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000).

Thus, in reviewing Wiggins's attack on his state court conviction, this Court must presume that factual determinations made by the state court are correct. Wiggins then bears the burden of rebutting this presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. Section 2254(e)(1).

## IV. Analysis of Issues Presented for Review

*Sufficiency of the Evidence* (Claim B)

### A.

Ms. Lacs, an elderly woman, was found drowned in the bathtub of her apartment at approximately 3:50 on the afternoon of Saturday, September 17, 1988. Testimony at trial placed Wiggins near Lacs's apartment (perhaps in conversation with her) at approximately 5:00 on the afternoon of Thursday, September 15, 1988, when Ms. Lacs was last seen alive. Later that evening, Wiggins and his girlfriend, Geraldine Armstrong, used Lacs's credit cards and drove her car.[7] They did

---

7. Aged forty-two at the time of the murder, Armstrong was fifteen years older than Wiggins. She was arrested with Wiggins and was subjected to a polygraph examination. Ac-

so again on Friday, and on Saturday they pawned a ring belonging to Ms. Lacs. Upon his arrest several days later, Wiggins falsely stated to the police that he had found Ms. Lacs's car with the credit cards and ring in it on the morning of Friday, September 16.

On its face this evidence appears compelling, and, particularly given the high degree of deference that must be given in federal habeas proceedings to the findings and rulings made by state courts, *see* 28 U.S.C. § 2254(d), it may seem surprising that I should find, as a matter of constitutional due process, that the evidence is not sufficient to sustain Wiggins's murder conviction. The governing standard of review aside, I have great respect for my state court colleagues and do not pretend to have greater acumen than they.[8] Nevertheless, I am convinced that, when the record is carefully analyzed, no rational finder of fact could have found Wiggins guilty of murder beyond a reasonable doubt, and that to do so involved an unreasonable application of clearly established federal law. *See Williams*, 529 U.S. at 407–408, 120 S.Ct. 1495.

I start my analysis with the evidence I have just summarized. The fact that Wiggins was observed to be near Ms. Lacs's apartment and perhaps speaking with her outside the apartment the last time she was seen alive does not itself establish that he was her murderer. Nor does the fact that Wiggins made a false exculpatory statement to the police about when he came into possession of Ms. Lacs's car, credit cards, and ring prove his involvement in the murder. Wiggins would have had equal incentive to lie about when and how he came to use Ms. Lacs's property if he had merely stolen the property without murdering Ms. Lacs.[9] Therefore, the only piece of evidence that arguably can be said to give rise to an inference that Wiggins murdered Ms. Lacs is that he possessed the property stolen from her shortly after she was last seen alive.

 Wiggins's conviction cannot be sustained on the basis of that inference,

---

cording to the examiner, she answered dishonestly in response to questions about whether she had been in Ms. Lacs's apartment and participated in the robbery. Nevertheless, she became a witness for the State and was never prosecuted.

8. I particularly note that though I find Judge Hinkel's thought process in finding Wiggins guilty to have been faulty, he should be commended for the honesty of his opinion. If I am correct in perceiving that Judge Hinkel deceived himself when he said that he was not relying upon any presumption arising from Wiggins's possession of the property recently stolen from Ms. Lacs, that is only because he straightforwardly set forth the reasons for his decision. Moreover, if Judge Hinkel had wanted to insulate his findings from review, he simply would have had to credit two of Wiggins's prison mates who testified that Wiggins confessed to them he had committed the murder. Judge Hinkel expressly declined to follow that route.

9. It should be noted that the record reveals that this hypothesis is not wholly conjectural or entirely implausible. One of the brothers of Wiggins's girlfriend, Geraldine Armstrong, had an apartment directly under the apartment of Ms. Lacs. Further, the trial testimony disclosed that another of Armstrong's brothers was involved in an angry confrontation with Armstrong and Wiggins on the evening of Thursday, September 15. It may be that if the robbery and murder occurred late in the afternoon or early in the evening of that day, one or both of the brothers may have been involved. Or it may be that Wiggins (who the record reflects was borderline mentally retarded) pilfered Ms. Lacs's keys and credit cards on Thursday afternoon, and that one or both of the brothers later returned to her apartment with the keys (borrowed or taken from Wiggins) and, in the course of looking for more loot, committed the murder. This hypothesis would be consistent with the testimony of Edith Vassar and physical evidence from the apartment, discussed *infra*.

however, for a very simple reason. Judge Hinkel expressly stated in his oral opinion finding Wiggins guilty that "my decision is not based on any presumption, arising from the recent possession of stolen property, but my belief and fact finding and decision is based upon all the evidence that I have weighed in this case and not by any presumption." An inference not drawn, or a presumption not relied upon, by the fact-finder is not a fact.[10] Accordingly, it is necessary to consider if there was other evidence upon which a rational finder of fact could have found Wiggins guilty beyond a reasonable doubt.

Proof that Ms. Lacs had died between 5:00 p.m. on Thursday, September 15, and 7:45 that evening—when, according to trial testimony, Wiggins was first observed driving her car—would certainly have sufficed. No witness, however, was able to testify on the basis of personal knowledge when Ms. Lacs died, and the medical testimony, viewed most favorably to the State, was at best inconclusive on the point. The death certificate, completed by Dr. Margarita Korell who performed the autopsy, estimated Ms. Lacs's time of death as Friday Evening, September 16, more than twenty-four hours after Wiggins is alleged

to have murdered her. Dr. Gregory Kaufmann, an expert pathologist called by Wiggins at the guilt/innocence phase of trial, testified that Ms. Lacs had been dead a maximum of eighteen hours when her body was photographed at 9:00 p.m. on Saturday, September 17. At the trial, Dr. Korell testified that "what the maximum period was" between the time of Ms. Lacs' death and the autopsy could not be stated "with any degree of medical certainty or probability."[11] In his oral opinion denying Wiggins's motion for a new trial, Judge Hinkel characterized Dr. Korell's testimony as being of "little value." (*See* Paper No. 3, Exhibit 13 at 30). He also discounted Dr. Kaufmann's testimony, finding that "there's nothing certain about medical testimony of this sort" and that "all the other evidence in this case was sufficient for me." (*Id.*, Exhibit 13 at 33–34).

### B.

In short, according to his own words, Judge Hinkel relied neither upon any presumption arising from Wiggins's possession of recently stolen property nor upon any medical testimony in finding Wiggins guilty. What other evidence was there to

---

**10.** In affirming Wiggins's conviction and sentence on direct appeal, the Maryland Court of Appeals relied upon the presumption, stating that "[u]nder the circumstances disclosed in the evidence, Wiggins's possession of the victim's property shortly after she was robbed and murdered support an inference that he was the perpetrator of both the robbery and the murder." *Wiggins v. State*, 324 Md. 551, 558, 597 A.2d at 1368–69 (Md.1991). The question of the constitutional sufficiency of the evidence aside, it seems to me to be a clear violation of due process of law for an appellate court, in affirming a conviction, to rely upon an inference that is only permissible and that was expressly rejected by the finder of fact.

**11.** Prior to the trial, Dr. Korell had told Ms. Nethercott, one of Wiggins's attorneys, that

"in her judgment the victim could not have been dead more than twenty-four hours from the time of the discovery of the body." Since the body was discovered at approximately 3:50 on the afternoon of Saturday, September 17, this was entirely inconsistent with the State's theory that Wiggins had murdered Ms. Lacs between 5:00 p.m. and 7:45 p.m. on Thursday, September 16. Shortly after this conversation, Dr. Korell called Ms. Nethercott back and retracted her opinion, saying that she had spoken with a superior and was changing her mind. Although these conversations were known to Judge Hinkel by virtue of oral argument on a pretrial motion, Wiggins's counsel did not cross-examine Dr. Korell about them at trial. The failure to do so constitutes one of Wiggins's ineffective assistance of counsel claims.

support that verdict? Judge Hinkel recited only five other factual findings when rendering his oral opinion finding Wiggins guilty: (1) Wiggins was "there [in the area of Ms. Lacs's apartment] at a relevant time;" (2) he gave a false exculpatory statement to the police concerning when he came into possession of Ms. Lacs's stolen property; (3) he knew Ms. Lacs; (4) Mary Elgert, one of Ms. Lacs's friends, testified that Ms. Lacs, who was wearing a blue skirt when her body was discovered on Saturday, had also been wearing a blue skirt at a luncheon on Thursday afternoon; and (5) Ms. Lacs's apartment had been ransacked. As stated above, neither of the first of these findings establishes that Wiggins murdered Ms. Lacs. Likewise, the fact that Wiggins knew Ms. Lacs obviously does not prove that he killed her.

The fourth fact recited by Judge Hinkel proves little or nothing. Assuming that Ms. Lacs was wearing a blue skirt on Thursday, this does not prove that she was murdered between 5:00 p.m. and 7:45 p.m. that day. Her killer may have come into her apartment after 7:45, or she may have put the same skirt on Friday or Saturday before being murdered. Moreover, in finding that Ms. Lacs was wearing a blue skirt on Thursday, Judge Hinkel had to discount other testimony. Elizabeth Lane, another of Ms. Lacs's friends who had been with her at the Thursday luncheon, was the one who reported her missing. In her report she told the police that Ms. Lacs had been wearing a red dress at the luncheon. Similarly, Chianti Thomas, an eleven-year-old girl who prior to trial had selected Wiggins's photograph as the man she had observed conversing with Ms. Lacs outside her apartment at approxi-

mately 5:00 on Thursday afternoon,[12] testified that Ms. Lacs had been wearing a red skirt at the time.

■ Of course, it is within the province of the fact-finder to determine what witnesses to credit and what witnesses to discredit. However, due process does not permit the fact-finder to reason backward from the conclusion that the defendant committed the crime, and to discredit or ignore every piece of evidence contrary to that hypothesis. As the Fourth Circuit has explained, "[t]o start with the assumption that the crime was committed and then to show that each piece of circumstantial evidence can be explained in a consistent manner is fundamentally different from examining each piece of evidence and finally concluding beyond a reasonable doubt that the defendant was guilty." *Evans–Smith v. Taylor*, 19 F.3d 899, 910 (4th Cir.1994). Judge Hinkel's unexplained selection of the testimony of Ms. Elgert over the testimony of Ms. Lane and Ms. Thomas on the question of the color of the dress or skirt Ms. Lacs was wearing on Thursday afternoon suggests that he fell into the trap cautioned against by the Fourth Circuit.

Judge Hinkel's discrediting of the testimony of Edith Vassar, another one of Ms. Lacs's friends, provides further evidence on the same point. Ms. Vassar, who also attended the Thursday luncheon, testified that she spoke with Ms. Lacs at 10:00 a.m. on the morning of Friday, September 16, to discuss their mutual plans for the day. This asserted conversation occurred after, under the State's theory of the case accepted by Judge Hinkel, Ms. Lacs had been murdered. Ms. Vassar stuck to her testimony despite the fact that on the eve

---

**12.** Ms. Thomas, who was called as a witness for the State, was unable to identify Wiggins at the trial. Wiggins also points out that she testified that the man she observed left the area after speaking with Ms. Lacs and that Judge Hinkel did not address this fact in his opinion.

of trial she received a telephone call from an unidentified caller who tried to persuade her that she and Ms. Lacs spoke on Thursday, not Friday. It may be that Ms. Vassar was incorrect in her recollection. In finding that her memory was faulty, however, Judge Hinkel gave no reason other than to say that "all of the other evidence in this case is so overwhelming that it [what Ms. Vassar testified to] is not so." As I have discussed, it is only if one starts from the premise that Wiggins was guilty that the other evidence of his guilt appears overwhelming.

### C.

Let me now turn to the issue of the ransacking of Ms. Lacs's apartment—the fifth factual finding Judge Hinkel alluded to in his oral opinion finding Wiggins guilty. To say that this fact proves that Wiggins was guilty begs the question. In order to reach that conclusion, one would have to find that Wiggins was the person who did the ransacking. There was, however, no evidence that he did so, other than an inference to be drawn from the fact that he possessed Ms. Lacs's stolen property—the inference that Judge Hinkel expressly stated he chose not to draw. Further, there was also evidence that Judge Hinkel did not address tending to show that Wiggins had not ransacked the apartment and, indeed, had not been involved in a struggle with Ms. Lacs. First, Wiggins's fingerprints were not found in the apartment, and unidentified fingerprints were found. Second, a Ryder baseball cap was recovered from the apartment, and no evidence was presented tying the cap to Wiggins. For example, neither Chianti Thomas nor Robert Weinberg, a contractor for whom Wiggins was working at the apartment complex where Ms. Lacs resided, testified that they had seen Wiggins wearing a baseball cap. Third, Wiggins had been painting all day on Thursday, Sep-

tember 15, and there was testimony from a witness for the State that he had to wash paint off when he arrived at his girlfriend's house that evening. No paint was found in Ms. Lacs's apartment. Fourth, Mr. Weinberg, upon whose testimony the State relied to establish that Wiggins was near Ms. Lacs's apartment at approximately 5:00 p.m. in the afternoon on September 15, testified that Wiggins returned approximately twenty minutes after having been released from work to say that he had moved some sheetrock. Weinberg further testified that Wiggins in fact had moved the sheetrock and that although this would have taken him only a few minutes, it was an approximately five minutes' walk each way from Weinberg's office to the place near Ms. Lacs's apartment where the sheetrock was located. This time sequence would not realistically have given Wiggins time to struggle with Ms. Lacs, run water in her bathtub and murder her, and ransack her apartment. Moreover, Weinberg did not testify that Wiggins was in any unusual emotion state when he returned to the office, as would have been likely if he had just committed a murder.

### *Ineffective Assistance of Counsel at Sentencing* (Claim N)

 The other claim I find meritorious is that Wiggins's trial counsel was ineffective during the sentencing proceeding in failing to develop a mitigation case. The Maryland courts' decisions that counsel was not ineffective involved an unreasonable application of clearly established federal law. Indeed, it is almost directly contrary to the Supreme Court's recent decision in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). There, the Court held that a defendant has "a right—indeed, a constitutionally protected right—to provide the jury with...mitigating evidence" and that defense counsel's failure to present such

evidence fell short of prevailing professional standards. *Id.* at 393–96, 120 S.Ct. 1495. The Court also found that under the facts of the case the "prejudice" prong of the test established by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) was met.[13] 529 U.S. at 396–98, 120 S.Ct. 1495. Wiggins's mitigation evidence was much stronger, and the State's evidence favoring imposition of the death penalty was far weaker, than the comparable evidence in *Williams*. Therefore, it follows *a fortiori* that Wiggins was prejudiced by his counsels' unprofessional errors.

The State seeks to justify trial counsels' decision as a tactical one. That contention, which was accepted by the Maryland courts, is based upon the testimony of trial counsel during the post-conviction hearing that they made the decision to "retry guilt" before the sentencing jury and that they did not want to dilute the effectiveness of their argument by presenting a mitigation case as well. (*See* Paper No. 3, Exhibit 35 at 27, 54–56). In fact, it appears that defense counsels' "tactical decision" was forced upon them by inattention and lack of preparation. Before the trial, lead counsel had taken a new full-time job in another county, spent only "a day a week or so" attending to his former responsibilities, and left it to his co-counsel to do "most of the work." (*Id.*, Exhibit 35

at 12–16, 40, 100). *See, e.g., Rose v. State*, 675 So.2d 567, 572 (Fla.1996)(finding a failure to investigate where, *inter alia*, counsel had been pressed for time because he had gotten married and gone on a ten-day honeymoon during the period prior to sentencing). Here, the attorney left in charge had previously worked on only one or two felony jury trials, had never before worked on a capital trial, and was "frankly overwhelmed" as the trial date approached. (*See* Paper No. 3, Exhibit 35 at 81–84, 100). Each of the defense attorneys testified that the other was responsible for preparing the mitigation case.[14] (*Id.*, Exhibit 35 at 27, 40, 112–113). *See Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998)(where failure to develop mitigating evidence resulted from counsel's "role confusion," that failure "can only be characterized as a deficiency in trial preparation, not a strategic decision"); *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir.1989)(holding that failure to investigate was due to "neglect" where "[e]ach lawyer testified that he believed that the other was responsible for preparing the penalty phase. . . .").

In any event, in order for a tactical decision to be reasonable, it must be based upon information the attorney has made after conducting a reasonable investigation. *See, e.g., Stouffer v. Reynolds*, 168

---

**13.** The well-established standard for proving an ineffective assistance of counsel claim requires petitioner to show that "counsel's representation fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). With regard to the first prong of this test, this Court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. 2052. All cir-

cumstances are to be considered, and this Court's scrutiny of counsel's conduct must be "highly deferential." *Id.* at 688–89, 104 S.Ct. 2052. Furthermore, even if counsel committed a professionally unreasonable error, relief can be granted only if "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

**14.** Neither the state post-conviction court nor the Maryland Court of Appeals addressed the "role confusion" issue in their opinions.

F.3d 1155, 1167 (10th Cir.1999)("In a capital case the attorney's duty to investigate all possible lines of defense is strictly observed") (citations omitted); *Jackson v. Herring,* 42 F.3d 1350, 1367–68 (11th Cir.1995)(decision to forego a mitigation presentation cannot be reasonable if it is supported by insufficient investigation). Wiggins's trial counsel conducted no such investigation. It is true that when making their decision solely to "retry guilt," counsel were aware of some mitigating information about Wiggins's unfortunate upbringing. (*See* Paper No. 3, Exhibit 35 at 33–34). However, their very possession of that information triggered their obligation to conduct a more complete investigation.[15] *See, e.g., Lockett v. Anderson,* 230 F.3d 695, 712–14 (5th Cir.2000)(finding a failure to investigate where counsel had notice of the defendant's possible psychological problems but failed to conduct further inquiry); *Hill v. Lockhart,* 28 F.3d 832, 845 (8th Cir.1994); *cf. Williams,* 529 U.S. at 396, 120 S.Ct. 1495 (noting that counsel failed to return a phone call of an accountant who offered to testify as to the defendant's positive experience in a prison ministry program). It did not excuse them of their duty at least to make a fully informed and deliberate decision on the question of whether to present a mitigation case.

Trial counsel were aware that it was a routine practice in the Maryland Public Defender's Office to retain an expert forensic worker to prepare a social history of capital defendants and that funds were available for that purpose. (*See* Paper No. 3, Exhibit 35 at 29–30, 32–33; Exhibit 36 at 33–34). If they had caused such a history to be prepared, they would have learned information that was far more extensive and detailed than the information they possessed when they made their tactical decision not to present a mitigation case.[16] Post-conviction counsel did have a social history prepared and, as a result, learned many crucial facts, including the following:

- As an infant, Wiggins and his siblings were routinely left alone and unfed for days at a time. (*See* Social History of Kevin Eugene Wiggins, Ex. Mem. Supp. Pt. for Habeas Corpus at 2–4).
- As a toddler, Wiggins witnessed one of his sisters routinely being sexually abused by an adult male friend of his mother. *Id.* at 6–7.
- At age 6, Wiggins was intentionally burned by his own mother on a hot stove as punishment for playing with matches. *Id.* at 5–6.
- Wiggins was physically abused by his first foster family and, from the age of 8 on, was sexually abused for many years by his second foster father. *Id.* at 9–12.
- Wiggins was raped by the teenaged sons of his fourth foster family. *Id.* at 20–21.
- At age 16, Wiggins was molested by his Job Corp Supervisor. *Id.* at 22–23.

15. Even a cursory review of the DSS records provides information that Wiggins possessed "borderline intelligence" and in fact may have been mentally retarded. As discussed *infra,* at the time of trial, the Supreme Court had held that mental retardation was a mitigator to be considered in capital cases. *See Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)("*Penry I*"). As noted in *Penry,* 492 U.S. at 334, 109 S.Ct. 2934, Maryland on July 1, 1989 became the second state to statutorily mandate that the mentally retarded not be subjected to capital punishment in some circumstances *Penry* was decided—and Maryland's statute took effect—prior to Wiggins's trial.

16. In its opinion, the Maryland Court of Appeals made the erroneous assumption that much of the critical information uncovered by the social history commissioned by post-conviction counsel had been contained in social service records available to trial counsel.

Clearly, this information "might well have influenced the jury's appraisal of...[Wiggins's] moral culpability." *Williams*, 529 U.S. at 398, 120 S.Ct. 1495. Thus, particularly since Wiggins had no prior criminal record, a tactical decision made by trial counsel in possession of this information not to present a mitigation case would have been virtually inexplicable.[17] In any event, Wiggins's trial counsel were under a duty to obtain the information necessary to make a reasoned decision and their failure to do so deprived him of effective assistance of counsel.

### Involuntary Waiver of Right to Trial by Jury (Claim A)

The Sixth Amendment protection that provides that the accused may elect the right to trial by an impartial jury[18] is made applicable to the states by the Fourteenth Amendment. *See Duncan v. Louisiana*, 391 U.S. 145, 154–55, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). In arguing that he invalidly waived his Sixth Amendment right, Wiggins also invokes the Fifth Amendment, contending that his waiver of a jury trial at the guilt/innocence stage of the proceedings was not knowing and voluntary because, at the time such election was required to be made, counsel had not arranged for an expert witness to be present at trial. Wiggins claims that the expert witness, who would testify concerning the victim's time of death, could not be present at the time set for trial, thus prompting counsel to pressure him to

forego his right to proceed before a jury of his peers. (*See* Paper No. 1 at 11). Respondents contend that with one exception, Wiggins is procedurally defaulted from presenting all aspects of the waiver issue for federal habeas corpus review. (*See* Paper No. 3 at 42–43). They further contend that the undefaulted portion of his claim is without merit. (*Id.* at 46–47).

The issue of invalid waiver of the right to trial by jury first surfaced on post conviction. In that petition, Wiggins complained that (a) his waiver of a jury trial was coerced; and (b) counsel rendered ineffective assistance by pressuring him to waive trial by jury. (*See* Paper No. 3, Exhibit 30 at 10–11 and 17 and Exhibit 33 at 12–13 and 18). The post conviction court found, based on the record and testimony, that "coercion" did not occur: instead, Wiggins had

"...listened to his trial counsel and their analysis of the situation of whether to take a judge or jury trial. Race, the heinous nature of the crime, and in the words of [Wiggins], his belief prejudice may have had an effect at the guilt/innocence phase, all played a part in making the decision to be tried by a judge. It was a decision made on the practicalities of the situation at the time."

(*Id.*, Exhibit 40 at 34). The post conviction court also found that "[m]any factors were involved in that decision, one of which was the possibility that an expert witness

---

**17.** The absence of a criminal record presumably would have dispelled any fear that counsel would have had that presentation of evidence about Wiggins's background would have been detrimental to him in terms of "future dangerousness," (*see* Paper No. 3, Exhibit 35 at 58, 127–28), one of the factors the jury was called upon to consider during the sentencing proceeding. Moreover, it would appear that mitigating information would Wiggins's vulnerability and limited intelligence would not have been strategically in-

consistent with "retrying guilt" during the sentencing phase. Indeed, it would seem that skillful counsel would have been able to mesh these facts into an effective argument that Wiggins had been made the pawn of others who were responsible for the murder. *See* footnote 9, *supra*.

**18.** *See also* U.S. Constitution Art. III, § 2 (trial of all crimes except impeachment shall be by jury).

might not be available at trial to give testimony on the all important topic of time of death." (*Id.*). Noting that Wiggins stated his reasons for electing to waive a jury at the guilt/innocence phase,[19] the post conviction court found no evidence that coercion by counsel led to Wiggins's decision to forego trial by jury at the first stage of trial. The post conviction court also found, based on testimony by trial counsel, that while the forensic pathologist enlisted by the defense might not have been available on certain dates, the pathologist would have been available to testify, and in fact did testify at trial. (*Id.*, Exhibit 35 at 24). The post conviction court accordingly rejected both aspects of Wiggins's involuntary waiver claim. (*Id.*, Exhibit 40 at 28–35 and 48–74).

On appeal from the denial of post conviction relief, Wiggins abandoned his "coercion" claim. Although it is not clear from the parties' appellate briefs, the Maryland Court of Appeals found that petitioner did preserve an "offshoot" of the waiver claim, by contending that the choice to forego trial by jury, even if voluntarily made, was forced on him through the incompetence of counsel. (*Id.*, Exhibit 50, *Wiggins v. State*, 352 Md. at 606, 724 A.2d 1). As noted by the Court of Appeals, the allegation

> . . . seems to rest on this statement from [Wiggins's post conviction] expert, Mr. Fisher:
>
> "If indeed what was the reason for waiving was simply this whole prob-

lem with getting their experts available and being able to go forward, that I think falls below the standards of adequate professional conduct. . . . But they had alternatives to that. They could have sought a continuance; they could have done a number of things that would have taken the dilemma which had been created and set it aside. But they didn't do that. So if that was the motivating factor or the primary motivating factor in their decision to go judge versus jury then I think that that falls below the standards of competent assistance of counsel."

It does not appear that Mr. Fisher, or anyone else, has faulted counsel for the decision of Dr. Breitenecker not to testify, or for their decision to retain Dr. Kauffman, who gave very favorable testimony for appellant. As Fisher did not specify what other "number of things" counsel could have done, it seems that his criticism lies in their failure to seek a postponement of trial rather than recommend that appellant proceed with a court trial. As [the post conviction court] noted, however, appellant made clear, when questioned about his choice to proceed non-jury, that it was not based on the availability of Dr. Kauffman or anyone else, but rather on his concern that a jury might be "more likely to go with the State." Other than post-conviction after-thought, there is nothing in the record to support the

---

19. The record of August 1, 1989 reveals the following colloquy:
 [Wiggins]: My decision is to go with a judge because I have the death penalty over my head, and I feel as though the people that agree to the death penalty are more likely to go with the State, and I feel as though, you know, that's a prejudice in that area.
 [The Court]: I understand then that you are giving up your right to a jury trial.
 [Wiggins]: Yes, sir.
 [The Court]: For this phase of the proceeding?
 [Wiggins]: Yes, I am.
 (*Id.*, Exhibit 3 at 15). It is apparent that Wiggins made this choice after considering various factors presented to him by trial counsel. (*Id.*, Exhibit 35 at 47–51).

claim that counsel were deficient in their selection of experts or to require a conclusion that they improperly induced appellant into waiving a jury trial.

(*Id.,* Exhibit 50, 352 Md. at 605–607, 724 A.2d 1).

██ Given this record, it appears that Wiggins has defaulted on that portion of his jury waiver claim alleging coercion, and that in any event, coercion was not employed to induce his waiver. The remaining aspect of the jury waiver claim—that trial counsel acted unprofessionally and rendered ineffective assistance by recommending waiver rather than seek a postponement due to the unavailability of an expert witness—was found by the post conviction court and the Maryland Court of Appeals to be without merit, based on the record and on controlling legal precedent.

██ An ineffective assistance of counsel claim is a mixed question of law and fact. *Strickland,* 466 U.S. at 698, 104 S.Ct. 2052. Under the amendment to 28 U.S.C. Section 2254(d), this Court cannot grant relief on this ground as long as the state court denied the ineffective assistance of counsel claim based upon a reasonable application of the *Strickland* standard to the facts presented during the state court proceedings. As set forth

above, after careful review of the record, it appears that the post conviction court and the appellate court that reviewed the post conviction decision reasonably applied the facts of the case to the *Strickland* standard in reviewing the ineffective assistance of counsel aspect of petitioner's jury waiver claim. The decisions reached by those courts do not reflect an unreasonable application of clearly established federal law, nor are they based on an unreasonable determination of the facts in light of evidence presented in those State court proceedings. Accordingly, petitioner is not entitled to relief on his claim of improper waiver of his right to trial by jury, pursuant to 28 U.S.C. § 2254(d).

### *Trial Court Error in Denying Motion for New Trial* (Claim C)

██ Wiggins asserts that his Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated when the trial court denied his motion for a new trial on the basis of the state medical examiner's change in testimony during sentencing proceedings. (*See* Paper No. 1 at 16). Assuming, without deciding, that the denial of a new trial impinges upon a fundamental right,[20] I find meritorious respondents' contention that this claim is procedurally defaulted and thus barred from federal habeas review.[21] Inasmuch

---

**20.** In *Herrera v. Collins,* 506 U.S. 390, 414, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the Supreme Court acknowledged that the Constitution does not itself contain mention of the right to a new trial. The Court then noted that even if the denial of a new trial can be said to implicate the Constitution, such would seemingly occur only where it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* at 407–08, 113 S.Ct. 853, *quoting Medina v. California,* 505 U.S. 437, 445–46, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992), *quoting in turn Patterson v. New York.* 432 U.S. 197, 202, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

**21.** On direct appeal, Wiggins relied on Maryland Rule 4–331 to support his argument that the trial court erred in failing to grant him a new trial. *See* Paper No. 3, Exhibit 15 at 34–38. He first invoked his constitutional bases to support his argument on post conviction (*Id.,* Exhibit 30 at 14–16). The post conviction court declined to consider the constitutional aspects of the new trial claim because the claim had been raised generally on appeal. *Id.,* Exhibit 40 at 38–41. Wiggins did not challenge this ruling when appealing denial of post conviction relief. *Id.,* Exhibit 44–46 and 50.

as Judge Hinkel did not rely upon the medical examiner's testimony in reaching his conclusions (*see* Paper No. 3, Exhibit 13 at 30, 33–34), it is unlikely that Wiggins was prejudiced as a result of Judge Hinkel's failure to grant a new trial. Relief will not be granted on this claim.

### Prosecutor's Failure to Disclose Exculpatory Evidence (Claim D)

 Wiggins next contends that the State failed to disclose exculpatory evidence in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights. (*See* Paper No. 1 at 17–18). To support his claim, Wiggins points to the fact that identical charges against Geraldine Armstrong (arrested with Wiggins in Mrs. Lacs's car several days after the murder) were dropped, and Armstrong testified against him at trial. From this fact, he proffers, based "on information and belief," that one of Armstrong's brothers lived in an apartment directly beneath the victim at the time of the murder, and that another of Armstrong's brothers visited with his brother at the brother's apartment the evening of the murder. He then asks this Court to accept additional proffers, again based "on information and belief," that Geraldine Armstrong received favorable treatment from the state in exchange for her testimony against him at trial; that the role of Armstrong's brothers in the murder was not investigated or pursued by the State as a result of Armstrong's agreement to testify; that the State did not disclose to petitioner prior to trial that Armstrong had been given such favorable treatment; and that the State did not disclose the possibility that Armstrong or her brothers might be responsible for the murder. (*See* Petition at 18).

As found by the post conviction court[22] and noted in this Court's March 9, 2001 Memorandum and Order, Wiggins has been unable to provide factual support for any of these suppositions. Accordingly, the state court findings must be upheld, pursuant to 2254(d).

### Ineffective Assistance of Counsel at Trial (Claim E)

 Wiggins alleges that counsel was ineffective at the guilt/innocence stage of trial, based on counsel's failure to (1) introduce evidence that Medical Examiner Korell changed her opinion respecting the victim's time of death; and (2) ensure that as of the time Wiggins had to elect whether to be tried by a judge or a jury, a defense expert would be available to testify concerning time of death. (*See* Paper No. 1 at 19–21).

As previously noted, in order to prevail on a Sixth Amendment claim of ineffective assistance, Wiggins must show that counsel's representation fell below an objective standard of reasonableness **and** that there is a reasonable probability that, but for counsel's errors, the results of the trial would have been different. *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. 2052. The Court of Appeals found

> ...neither a Constitutional deficiency nor Constitutional prejudice in counsel's failure to cross-examine Dr. Korell (at trial or at the sentencing proceeding) or in the decision not to have Ms. Nethercott testify with regard to her conversation with Dr. Korell. Taking the second matter first, there is absolutely nothing in this record suggesting any need for Ms. Nethercott to have testified. There is no indication whatever that, had Dr. Korell been asked about the two conver-

---

22. *See* Paper No. 3, Exhibit 40 at 40 at 42–44 and 256–57; *see also* Exhibit 35 at 72–77; Exhibit 36 at 98–129; Exhibit 37 at 20; Exhibit 39 at 5–10.

sations with Ms. Nethercott, or about her conversation with Dr. Dixon, she would have denied either the fact or the content of those conversations. Ms. Nethercott's concern in that regard has utterly no foundation and should never have been a factor in deciding whether to question Dr. Korell about the matter. The question of whether Dr. Korell should have been cross-examined about her initial view and her change of opinion must be examined in context. Several considerations are relevant. Viewing the matter at the time of trial, it is clear that Judge Hinkel was fully aware of what had occurred. Without contradiction by the prosecutor, Mr. Schlaich had informed the judge at the hearing on the pre-trial motion to dismiss or narrow the indictment of the various conversations with Dr. Korell, and Ms. Nethercott reminded Judge Hinkel of that situation in her opening statement at trial. When Dr. Korell testified at trial, she gave a range of from 24 to 48 hours, but said that it was all guesswork and that a time of death could not be pinpointed. In Ms. Nethercott's uncontradicted view, Dr. Korell was not an effective witness; she did not make a good presentation.

More significant, perhaps, is the fact that Dr. Korell's trial testimony, giving a guesswork range of 24 to 48 hours, still put the earliest time of death at 9:00 Thursday evening—at least two hours after appellant was in possession of the victim's car, credit cards, and ring. Although that testimony was neither as firm nor as favorable to appellant as Dr. Korell's initial view, it still was more exculpatory than inculpatory. Both at the time of trial and at the time of the sentencing proceeding (1989), the law in Maryland was that a prior inconsistent statement by a witness, other than a party, was admissible only to impeach the witness's credibility, and not as substantive evidence. [Citations omitted]. Not until *Nance v. State,* 331 Md. 549, 629 A.2d 633 (1993) was that rule relaxed to permit an inconsistent statement to be admitted as substantive evidence if the statement was reduced to writing and either signed or otherwise adopted by the witness. Thus, Dr. Korell's initial view, expressed orally to Ms. Nethercott, that Ms. Lacs had died no earlier than late afternoon on Friday could not have been used as substantive evidence as to time of death but only to impeach the credibility of her testimony that (1) death could have occurred 24 hours earlier, but (2) there was no sure way to tell. To have attempted to impeach that testimony by cross-examining her about her initial view would have permitted Dr. Korell to describe her conversation with Dr. Dixon, to have acknowledged that she was wrong in her initial view, and to have explained why she was wrong. It would have placed before Judge Hinkel no information of which he was not already aware, but may have allowed Dr. Korell to strengthen her resolve about the 48 hours, which would have created an even more dramatic conflict with Dr. Kauffman's opinion.

In announcing his verdict and in denying the motion for new trial, Judge Hinkel said that he placed no weight on the medical testimony as to time of death.* We cannot imagine what additional benefit, as a practical matter, would have accrued to appellant from further impeachment of Dr. Korell. Failure to press the point already known to Judge Hinkel does not, in our view, overcome the presumption of sound trial strategy; nor can we conclude that, as a result of the omission, "the result of the proceed-

ing was fundamentally unfair or unreliable."

---

\* Appellant contends that, had evidence of Dr. Korell's initial opinion been before Judge Hinkel, he might not have disregarded Dr. Kauffman's view that death occurred on Saturday, September 17. To a large extent, that assumes that Dr. Korell's initial opinion could have been used as substantive evidence for the proposition that it is possible to determine more precisely a time of death, which, as noted, is not the case. Moreover, it is clear from his remarks that Judge Hinkel was not relying on the more abstract question of whether it was possible to establish a time of death; he left in evidence that Dr. Korell could not, herself, testify, within a reasonable degree of medical certainty, the earliest time of death and simply did not credit Dr. Kauffman's opinion that death occurred on Saturday, September 17. Discrediting Dr. Korell's testimony regarding her inability to determine more precisely a time of death would not have enhanced the credibility of Dr. Kauffman's opinion.

(*See* Paper No. 3, Exhibit 50; 352 Md. at 603–05, 724 A.2d at 12–14). I agree with the appellate court's determination that counsel's performance was not unconstitutionally deficient with regard to the cross-examination of the medical examiner, and that prejudice did not result, since in any event, Judge Hinkel did not rely upon either expert's testimony concerning time of death in rendering his decision as to Wiggins's guilt. Neither prong of *Strickland* has been satisfied, and thus the appellate court's findings must be upheld as a reasonable application of law and fact.

The issue concerning whether a defense expert was available to testify concerning time of death has been fully examined in Claim A above, and will not be reexamined here.

### Use of Unreliable Identification Evidence at Trial (Claim F)

Petitioner next claims that twelve-year-old Chianti Thomas's pretrial identification of him was violative of Fifth, Sixth, Eighth and Fourteen Amendments, because it was obtained through the use of impermissibly suggestive police procedures that created a substantial risk of erroneous identification. (*See* Paper No. 1 at 22).

■ The Due Process Clause protects suspects against identification procedures which are impermissibly suggestive and conducive to irreparably mistaken identifications. See *Manson v. Brathwaite,* 432 U.S. 98, 113, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). To succeed on a due process claim, petitioner must first prove that the identification procedure was impermissibly suggestive. If impermissible suggestiveness is shown, the court must then analyze whether the identification nevertheless was reliable under the totality of the circumstances. *Manson,* 432 U.S. at 114–117, 97 S.Ct. 2243; *United States v. Dorta,* 783 F.2d 1179, 1183 (4th Cir.)(identification reliable even if pretrial photo display impermissibly suggestive where witness had several previous encounters with suspect). This standard is used whether the identification is based on a "show up" or, as here, based on photographs. See *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Harker v. Maryland,* 800 F.2d 437, 444 (4th Cir.1986).

■ Although the subject of a pretrial motion, Chianti Thomas's allegedly tainted pretrial identification of Wiggins was not raised on direct appeal. (*See* Paper No. 3, Exhibits 15, 16 and 26). The post conviction court held that the claim was waived, but nonetheless reviewed it on the merits, finding no due process violation under

state case law.[23] (*Id.,* Exhibit 40 at 44–48). Petitioner then abandoned his claim, failing to raise it in his appellate attack on the post conviction court's decision. (*Id.,* Exhibits 44–46 and 50). This failure to present the pretrial identification claim to the Court of Appeals when challenging the denial of post conviction relief precludes this Court from further consideration of the claim, based upon the procedural default doctrine discussed above.

*Impropriety in Selecting the Grand Jury and Sentencing Jury* (Claim G)

■ Wiggins asserts that at sentencing he was denied his right to trial by an impartial jury of his peers. He claims that the grand jury that indicted him and the petit jury that sentenced him were selected in a manner that violated the Fourteenth Amendment's Equal Protection Clause, thereby depriving him of a jury representing a fair cross-section of the community due to the systematic exclusion of racial minorities and other distinct groups of persons. (*See* Paper No. 1 at 22). Respondents argue that this claim is procedurally defaulted and otherwise without merit. (*See* Paper No. 3 at 67–69).

■ Under state law, Wiggins was entitled to a jury at his capital sentencing proceedings.[24] Prior to jury selection, Wiggins through counsel challenged the array of prospective jurors, noting that of the 104 venire persons, only three were African American.[25] (*See* Paper No. 3, Exhibit 8 at 11–12) Counsel did not present any evidence to support his contention that the percentage was due to systematic

exclusion of African Americans from the panel, and the challenge to the array was denied. (*Id.*). No claim concerning the composition of the array was presented on direct appeal.

■ On post conviction, Wiggins argued that the manner in which Baltimore County selects grand jurors and petit jurors—to wit, through the use of voter registration lists—was improper. He further contended that trial counsel was ineffective in failing to develop evidence to support a challenge to the array of jurors. (*Id.,* Exhibit 30 at 17–19 and 35–36 and Exhibit 33 at 22–23). The post conviction court heard evidence concerning the process for juror selection in Baltimore County and trial counsel's allegedly deficient performance with regard to the jury challenge, and rejected both claims. (*Id.,* Exhibit 40 at 102–137). In appealing that decision, Wiggins abandoned his claim that the County's jury selection process systematically excluded African Americans, and pursued only the ineffective assistance portion of the jury composition claim. (*Id.,* Exhibit 44 at 46–48 and Exhibit 50, 352 Md. at 607–08, 724 A.2d at 15). Wiggins has defaulted on the portion of the juror array issue presented here. He has failed to show cause for the default, and prejudice cannot be inferred, inasmuch as the use of voter registration lists for selection of juror pools passes constitutional muster. *See Truesdale v. Moore,* 142 F.3d 749, 755–56 (4th Cir.), *cert. denied,* 525 U.S. 951, 119 S.Ct. 380, 142 L.Ed.2d 314 (1998).

---

23. *See Sallie v. State,* 24 Md.App. 468, 473, 332 A.2d 316 (1975); *Smith and Samuels v. State,* 6 Md.App. 59, 250 A.2d 285, 289 (1969). The reasoning set forth in the state cases appears to parallel that later set forth by the Supreme Court in *Manson.*

24. *See* Md.Code Ann., Art. 27, § 413(b)(1996 Repl.Vol.); *Bruce v. State,* 328 Md. 594, 599, 616 A.2d 392, 395 (1992).

25. According to counsel, at the time Wiggins was tried, the percentage of African Americans in Baltimore County was roughly 13% of the population. *Id,* Exhibit 8 at 11–12.

### Inadequate Voir Dire of Prospective Jurors (Claim H)

Similarly, Wiggins has defaulted on his claim that he was denied his right to adequate voir dire in order to delve into the racial attitudes of prospective jurors, as well as ascertain the prospect of bias resulting from their status as prior victims of crime; their possible bias in favor of law enforcement personnel; and their ability to evaluate and respond to mitigating evidence. (*See* Paper No. 1 at 24). Wiggins's contention of inadequate voir dire of prospective jurors was not raised on direct appeal, but instead was presented unsuccessfully at post conviction. (*See* Paper No. 3, Exhibit 30 at 20–24 and Exhibit 40 at 137–66). Wiggins did not seek to appeal the post conviction court's determination of the voir dire issues. (*Id.*, Exhibits 44, 46 and 50). Neither cause for abandoning these issues, nor prejudice resulting therefrom, has been demonstrated, and accordingly review of the process by which prospective jurors were screened is barred under the procedural default doctrine.

### Trial Court Error in Excusing Prospective Jurors (Claim I)

Wiggins's next claim concerns prospective jurors whose excusal he claims violated his Constitutional rights. Again citing the Fifth, Sixth, Eighth and Fourteenth Amendments, Wiggins contends that these jurors should not have been excused, because they "did not sufficiently express during voir dire that their personal feelings against the death penalty were sufficiently strong to prevent them from following the law and performing their duty" if chosen for the jury. (*See* Paper No. 1 at 25). As noted by respondents, this claim also is barred from consideration under the procedural default doctrine.

Wiggins did not present this claim on direct appeal. The post conviction court denied relief (*see* Paper No. 3, Exhibit 40 at 166–78), and petitioner did not pursue the claim on appeal from that decision. (*Id.*, Exhibits 44–46 and 50). Petitioner has not shown cause and prejudice sufficient to overcome his default with regard to this issue.

### Insufficiency of the Evidence by which the Sentencing Jury Found an Aggravating Factor (Claim J) and Insufficiency of the Evidence by which the Sentencing Jury Found First Degree Principalship (Claim K)

Based on my previous finding that the evidence was constitutionally insufficient to sustain Wiggins's conviction, these claims have been rendered moot and need not be decided here.

### Erroneous Evidentiary Rulings at the Sentencing Phase (Claim L)

Wiggins next asserts that the trial court improperly excluded relevant mitigating evidence, and admitted other evidence that was irrelevant and highly prejudicial. He claims that evidence that the prosecution had offered him a plea bargain in which he would have received a life sentence; evidence that other defendants convicted of murder under similar circumstances had not received the death penalty, and that the death penalty would be disproportionate as applied to him; and evidence showing that the death penalty is not imposed with any frequency in Maryland in like circumstances was improperly excluded. He further contends that other evidence was improperly admitted, including the testimony of a police officer with regard to *TV Guide* magazines found in the victim's apartment and testimony of the victim's friend who commented on the victim's personality. (*See* Paper No. 1 at 28). Respondents' argument to the contrary, it appears that Wiggins properly presented

these evidentiary claims in the state courts, thus requiring this Court to examine each of the claims here.

Wiggins first contends that the evidence of the State's offer of a plea in exchange for a life sentence should have been presented to the jury as mitigating evidence, and was erroneously excluded by the trial court. The Maryland Court of Appeals examined this claim and found that:

[p]rior to sentencing, the State moved *in limine* to exclude evidence of its offer of a life sentence in exchange for a guilty plea. Wiggins had indicated an intention to introduce evidence of this offer during the sentencing hearing. The court ruled that while the offer, if admitted in evidence, would "mitigate [ ] in favor of the defendant," it was not admissible before the sentencing authority as it would seriously cripple the plea negotiation process in capital sentencing prosecutions.

Wiggins argues that the State's plea offer was properly admissible as mitigating evidence because, under *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the sentencing authority in capital cases must be permitted to consider any relevant mitigating factor, i.e., anything that might serve as a basis for a sentence less than death. Specifically, Wiggins says that the State's offer, for whatever reason it was made, demonstrated its belief that a life sentence was appropriate in the case and had this been known to the sentencing jury it would not have imposed the death sentence.

In *Lockett*, 438 U.S. at 605, 98 S.Ct. 2954...the Supreme Court held that

"The Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a

defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

(Emphasis in original: footnotes omitted.) Nothing in *Lockett*, the Court said, "limits the traditional authority of the court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense". *Id.* at 605, n. 12, 98 S.Ct. 2954...quoted in *Johnson, supra.*, 303 Md. at 527–28, 495 A.2d 1.

We have said that the appropriateness of sentences other than death may be considered by the sentencer as a mitigating circumstance in a capital prosecution. *See Hunt v. State*, 321 Md. 387, 404, 583 A.2d 218 (1990); *Doering v. State*, 313 Md. 384, 545 A.2d 1281 (1988); *Harris v. State*, 312 Md. 225, 539 A.2d 637 (1988). In *Hunt*, the defendant did not seek timely admission of evidence of his sentence for a handgun offense, and his request to reopen his case to offer it was denied by the trial judge. We held that the evidence would have been admissible in Hunt's case-in-chief, as evidence that "would aid the jury in assessing the legal and practical effect of a sentence less than death," 321 Md. at 404, 583 A.2d 218, but that the trial judge did not abuse his discretion in denying the request to reopen. In *Harris*, we held that evidence of the sentences imposed on the defendant for a related robbery offense, where the robbery was the statutory aggravating factor in a capital sentencing proceeding, was admissible. We reasoned that the sentencer might consider, as a mitigating factor, the fact that the defendant had already been appropriately sentenced for that crime. In *Doering*, we held that a defendant in a capital sentencing proceeding may introduce rele-

vant and competent information regarding his eligibility for parole in the event a life sentence is imposed. We explained that the sentencer, in seeking to determine the appropriateness of a life sentence, would be aided by information correctly describing the legal and practical effects of such a sentence, and that the existence of an appropriate alternative sentence may be considered as a relevant mitigating circumstance. *Doering*, 313 Md. at 412, 545 A.2d 1281. In these three cases, the factors with the potential to mitigate were related to the actual amount of time the defendant was likely to spend in prison in the event the jury elected to impose a life sentence; consequently, they constituted relevant information for the jury to consider in determining the appropriate disposition.

Evidence of a plea offer, on the other hand, is not an appropriate factor to aid the jury in making its determination. As Wiggins concedes, the State may have sought a guilty plea to avoid the possibility of an acquittal in a case which involved largely circumstantial evidence. This prosecutorial concern would not, therefore, necessarily indicate that the State considered a life sentence to be the appropriate punishment for Wiggins's crimes. In other words, as the State suggests, its plea offer did not reflect on either the crime or the character of the defendant; rather, it resulted after the State evaluated the strength of its case and the concern that it had that the jury might not return a guilty verdict. Thus, the evidence of the plea offer did not bear on the defendant's character, prior record, or the circumstances of the crime, and was not relevant mitigating evidence. *See Calhoun v. State*, 297 Md. 563, 468 A.2d 45 (1983).

(*See* Paper No. 3, Exhibit 26; 324 Md. at 572–74, 597 A.2d at 1369–70).

A sentencer in a capital case must be permitted to consider any relevant mitigating factor. *See Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). However, the factor must not only be "mitigating" in general, but also must be "relevant" in particular. *See Blystone v. Pennsylvania,* 494 U.S. 299, 307, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990)("[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence"). To be relevant, evidence must pertain to an "aspect of a defendant's character or record [or] any of the circumstances of the offense." *See Franklin v. Lynaugh,* 487 U.S. 164, 174, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)(plurality), *quoting Eddings v. Oklahoma,* 455 U.S. at 110, 102 S.Ct. 869. The Supreme Court has construed "circumstances of the crime" narrowly. *Franklin,* 487 U.S. at 174, 108 S.Ct. 2320 ("residual doubt" as to defendant's guilt held not to be a "circumstance of the offense"); *Blystone,* 494 U.S. at 306–06, 110 S.Ct. 1078 (defendant not entitled to an instruction permitting the supposed insubstantiality of the State's aggravating circumstances to be considered as a mitigating circumstance). Where, as here, the motivating factor behind the plea offer may have been a desire to avoid the possibility of acquittal due to the circumstantial nature of the evidence—rather than the State's belief that the circumstances of the offense were undeserving of the ultimate punishment—Wiggins cannot offer evidence of the plea offer in order to generate a "residual doubt" at sentencing as to the correctness of his conviction, or to have the jury speculate as to the possible motivations for the State's offer.[26]

---

**26.** Respondents note by way of analogy that

under Rule 408 of the Federal Rules of Evi-

With regard to Wiggins's claim that other mitigating evidence was wrongfully excluded at sentencing, the Maryland Court of Appeals found as follows:

Wiggins next contends that the trial court erred in excluding from the consideration of the sentencing jury, as relevant mitigating evidence, a three-volume collection of documents detailing potentially capital cases where a sentence less than death was imposed. He draws attention to Art. 27, § 414(e)(4), which requires this Court in every case where the death sentence has been imposed to compare it to those imposed "in similar cases" to ensure that it is not excessive or disproportionate, "considering both the crime and the defendant." Wiggins claims that sentence proportionality is an appropriate consideration for the sentencing authority as well, and that the proffered evidence should have been admitted for its consideration. He claims that, lacking this information, the sentencing jury did not have relevant information to make its sentencing decision—information which, he says, is traditionally relevant in determining the appropriate sentence and which would have assisted a jury in determining the weight to be given to aggravating factors in weighing them against mitigating circumstances. In this regard, Wiggins says that had the jury known of the frequency with which life imprisonment is imposed in murder cases of a more extreme nature than his own, it might well have determined to return a sentence less than death.

In *White v. State*, 322 Md. 738, 589 A.2d 969 (1991), we noted that proportionality review in capital sentencing cases under Art. 27, § 414(e)(4) requires the review

to be conducted by this Court and not by the sentencing authority. We further noted that there is no federal constitutional requirement of proportionality review in death penalty cases, citing *Pulley v. Harris*, 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). While we recognized that evidence proffered by a defendant to establish the existence of a mitigating circumstance should be generously viewed by the sentencer, we also said that mitigating circumstances are "defendant specific" and "incident specific" and that ordinarily the findings regarding another person do not in any way tend to establish a material fact beneficial to an entirely different individual. *White, supra.,* 322 Md. at 750, 589 A.2d 969; *Johnson v. State, supra,* 303 Md. at 528–29, 495 A.2d 1. For like reasons, we also find no merit in Wiggins's further argument that the trial court erred in excluding from evidence a law review article chronicling a study which, according to the author, uncovered 350 cases in which a miscarriage of justice occurred in a potentially capital case.

(*See* Paper No. 3, Exhibit 26; 324 Md. at 574–76, 597 A.2d at 1370–71).

I agree with this finding that this documentary evidence was relevant only with regard to the appellate court's statutorily-mandated proportionality review, and was considered in accordance with State law. (*Id.,* Exhibit 26; 324 Md. at 580–82, 597 A.2d at 1373–74). It does not constitute mitigating evidence as contemplated by *Lockett v. Ohio* and other cases cited above, in large part because it consisted of information from other cases involving other defendants, and did not reflect on any aspect of Wiggins's character, record, or

dence, a plea offer or similar compromise proposal is irrelevant and inadmissible in the

proceeding to which the offer pertained.

circumstances of the offense. *Franklin v. Lynaugh,* 487 U.S. at 174, 108 S.Ct. 2320; *Eddings v. Oklahoma,* 455 U.S. at 110, 102 S.Ct. 869. As such, it was properly excluded from consideration by the jury. In any event, as correctly noted by Maryland's highest appellate court, there is no constitutional requirement that a defendant receive proportionality review, even on appeal. *See Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

With regard to Wiggins's claim that evidence was improperly admitted at sentencing, the Maryland Court of Appeals found as follows:

Wiggins next claims that the trial judge, during the sentencing hearing, committed reversible error when he admitted evidence relating to a *T.V. Guide* book found in the victim's apartment at the time her body was discovered. Specifically, he claims that testimony by a police officer describing a *T.V. Guide* magazine with markings on all of the pages through the date that the victim was last seen alive, but not thereafter.... was irrelevant and prejudicial. He argues that it had no probative value, because no witness testified regarding the victim's habit of marking T.V. Guide magazines. Therefore, he says, it is not known when these marks were made, why they were made, or even by whom they were made.

In *State v. Joynes,* 314 Md. 113, 119, 549 A.2d 380 (1988), we applied the test which governs the admissibility of evidence in a criminal case. We noted that there are two important components of relevant evidence; materiality and probative value. Materiality looks to the relation between the proposition for which the evidence is offered and the issues in the case. Probative value is the tendency of evidence to establish the proposition that it is offered to prove. Evidence which is not probative of the proposition at which it is directed is irrelevant. *Id.* at 119, 549 A.2d 380. Thus, to be of probative value, evidence must only have a tendency to prove the fact at issue; it need not establish the fact conclusively or be beyond doubt.

A daily pattern of marking each day's television programs was reflected in the magazine, and it ceased as of the time the victim was last seen alive. While it is theoretically possible that someone other than the victim made the marks, or that they were made randomly, or were all made on one day, these possibilities do not circumscribe the relevance and admissibility of the evidence. The victim lived alone, and the factfinder could infer that the markings were made on a day-to-day basis, in a contemporaneous fashion, consistent with the victim's daily television viewing selections. We think that the date on which the markings ceased had a tendency to prove that the victim died on September 15 and, therefore, the evidence was properly admitted.

(*See* Paper No. 3, Exhibit 26; 324 Md. at 578–79, 597 A.2d at 1372–73).

Wiggins's contention to the contrary, the admission of the *TV Guide* does not implicate the Due Process Clause of the Fourteenth Amendment. Because the court's ruling involves only a matter of state evidentiary law, it is not a ground for relief here. *See generally Estelle v. McGuire,* 502 U.S. 62, 67–70, 112 S.Ct. 475, 116 L.Ed.2d 385 (rejecting claim that admission of evidence violated the Fourteenth Amendment's due process guarantee).

Wiggins's next contention concerning the impact of "victim impact evidence" is equally unpersuasive. As noted by the Maryland Court of Appeals:

Wiggins further complains that testimony by one of the victim's friends, Mary Elgert, constituted victim impact evidence which was inadmissible under *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). Specifically, Ms. Elgert testified that the victim was "a very happy-go-lucky person" who was "always thinking of something interesting."

We think it clear that Ms. Elgert's testimony could in no event be deemed victim impact evidence under the Court's decision in *Booth;* it did not describe the impact of the crime on the victim's family, or the family members' opinion, and characterizations of the crime and the defendants. *See Mills v. State*, 310 Md. 33, 72–73, n. 14, 527 A.2d 3 (1987), *rev'd on other grounds*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). The even more compelling answer to Wiggins's contention is that in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court reversed its earlier holding in *Booth*, concluding that the Eighth Amendment does not prohibit a jury from considering, at a capital sentencing hearing, "victim impact" evidence relating to a victim's personal characteristics, and the emotional impact of the murder on the victim's family. Accordingly, there was no error in admitting Ms. Elgert's testimony in evidence.

(*See* Paper No. 3, Exhibit 26; 324 Md. at 579–80, 597 A.2d at 1373).

The state appellate court's finding is a reasonable application of Supreme Court precedent and will not be overturned here.

*Error in Instructing the Jury* (Claim M)

Wiggins also contends that he was denied his Fifth, Sixth, Eighth and Fourteenth Amendment rights due to the trial court's failure to give proper instructions to the jury. Specifically, he argues that the trial court failed to properly instruct the jury with regard to (1) the nature and function of mitigating circumstances; and (2) the principle of lingering doubt. He further contends that the trial court (3) failed to list nonstatutory mitigating circumstances individually; (4) improperly instructed the jury on the issue of reasonable doubt; (5) failed to require the State to prove that aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt; and (6) failed to require that mitigating circumstances be proven by a preponderance of the evidence before they could be considered in the sentencing judgment. (*See* Paper No. 1 at 29).

Respondents correctly contend that contentions (1) through (4) are procedurally defaulted, because they were raised on post conviction review but not thereafter preserved on appeal.[27] (*See* Paper No. 3, Exhibits 44–46 and 50). Relief is unavailing on the two nondefaulted aspects of this claim (contentions (5) and (6)).

Maryland's death penalty statute requires a defendant to prove mitigating evidence by a preponderance of the evidence.[28] Furthermore, if the jury finds that one or more mitigating circumstance exists, the statute requires the jury to determine whether, by a preponderance of the evidence, the aggravating circumstances outweigh the mitigating circumstances.[29] The jury's reliance on these provisions in Wiggins's case were declared

---

**27.** Neither cause nor prejudice sufficient to overcome procedural default can be found in the record or pleadings.

**28.** *See* Md.Code Ann., Art. 27, § 413(g).

**29.** *Id.,* § 413(h).

constitutional by Maryland's highest appellate court. (*See* Paper No. 3, Exhibit 26; 324 Md. at 582–83, 597 A.2d at 1374).

Existing Supreme Court precedent supports the constitutionality of the Maryland statute. In *Walton v. Arizona*, 497 U.S. 639, 649, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)(plurality), Arizona's capital sentencing statute was challenged because it imposed on defendants the burden of establishing, by a preponderance of the evidence, mitigating circumstances sufficiently substantial to call for leniency. Four members of the Supreme Court concluded that such a burden did not violate a defendant's constitutional rights. *Id.* at 650, 110 S.Ct. 3047. These justices also concluded that the Court's decision in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) "did not suggest that it would be forbidden to require". each...juror, before weighing a claimed mitigating circumstance in the balance, to be convinced in his or her own mind that the mitigating circumstance has been proved by a preponderance of the evidence. *Id,* 497 U.S. at 651, 110 S.Ct. 3047. This same plurality indicated that nothing in *Mills* "hinted that there was any constitutional objection to that aspect of the instructions" requiring that mitigating circumstances be proved by a preponderance of the evidence. *Id.*[30] *See also Thomas–Bey v. Smith*, 869 F.Supp. 1214, 1222–24 (D.Md.1994)(rejecting, on basis of principle of non-retroactivity of *Teague v. Lane*,[31] claim that Maryland's capital sentencing statute is unconstitutional because aggravating circumstances need outweigh mitigating circumstances by only a preponderance of the evidence). The Maryland Court of Appeals' decision regarding the issue of allocating to the defendant the burden to prove mitigating circumstances is not an unreasonable application of Supreme Court precedent and must be upheld under 28 U.S.C. § 2254(d).[32]

The defendant in *Walton* also attacked Arizona's capital sentencing statute because it provided for the imposition of the death penalty if one or more aggravating circumstance was found and mitigating circumstances were insufficient to call for leniency. *Id.* at 651, 110 S.Ct. 3047. The plurality in *Walton*, relying on *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), found constitutional a jury instruction stating that if jurors concluded that the aggravating circumstances outweigh the mitigating circumstances, the death penalty must be imposed.[33] The Court also examined its holding in *Blystone*,[34] wherein the Court had held that the presence of aggravating circumstances serves the purpose of limiting the class of death eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by a jury. *Id.*, 494 U.S. at 306–07, 110 S.Ct. 1078; *Walton*, 497 U.S. at 651–62, 110 S.Ct. 3047. The finding of the Maryland Court of Appeals is supported by Supreme Court precedent, which finds no constitutional prohi-

**30.** Justice Scalia found no Eighth Amendment violation on other grounds. *Id.* at 656–74, 110 S.Ct. 3047.

**31.** *489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).*

**32.** Indeed, the Supreme Court held, in *Buchanan v. Angelone*, 522 U.S. 269, 279, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998), that the absence of instructions on the concept of miti-

gation and on particular statutorily defined mitigating factors did not violate the Eighth and Fourteenth Amendments.

**33.** *Id.,* 497 U.S. at 652, 110 S.Ct. 3047; *see also Boyde*, 494 U.S. at 374, 110 S.Ct. 1190.

**34.** *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990).

bition against instruction that a sentence of death is appropriate where a capital sentencer finds that aggravating circumstances outweigh the mitigating circumstances.

### Imposition of Capital Punishment on a Mentally Retarded Individual
### (Claim O)

Wiggins next contends that it is unconstitutional to impose capital punishment on a mentally retarded individual. Respondents argue that the record does not demonstrate that Wiggins is mentally retarded and, in any event, the contention as presented is barred by the procedural default doctrine.

■ It appears that the issue of imposition of capital punishment on the mentally retarded was fully explored—in the context of ineffective assistance of trial counsel at sentencing—at the post conviction hearing. *See* Paper No. 3, Exhibit 35 at 33–35. The issue was also raised on post conviction in pre-hearing memoranda, both in the context of ineffective assistance of counsel (*id.,* Exhibit 30 at 35 and Exhibit 32 at 13–19) and in the context of an Eighth Amendment violation. (*Id.,* Exhibit 30 at 31). These aspects of the issue were presented in Wiggins's application for leave to appeal the denial of post conviction relief. (*Id.,* Exhibit 41 at 14–20 and 21–22 (ineffective assistance claim) and at 59 (Eighth Amendment claim)). I find that both aspects of the issue are fully exhausted; are not subject to the procedural default doctrine; and must be examined on the merits here.

Counsel's failure to raise the issue of mental retardation in mitigation at sentencing is but one piece of the "ineffective assistance of counsel" puzzle more fully explored above.[35] Relief has been granted generally on the ground of ineffective assistance of counsel at sentencing, and need not be explored anew here.

On June 26, 1989 (subsequent to Ms. Lacs's murder, but prior to Wiggins's trial), a divided Supreme Court remanded a capital case involving a mentally retarded individual condemned to death by a Texas jury. As noted above, while the Court declined to hold that the execution of mentally retarded people convicted of capital offenses was categorically prohibited by the Eighth Amendment, a majority of the Court found that mental retardation "may well lessen a defendant's culpability for a capital offense...." and that sentencers must be able to "consider and give effect to mitigating evidence of mental retardation in imposing sentence," so that "an individualized determination whether ' death is the appropriate punishment' can be made in each particular case." *See Penry v. Lynaugh,* 492 U.S. 302 at 335, 340, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)(*Penry I* ).

Four days later, an amendment to Md. Code. Ann., Art. 27, § 412 took effect.[36] The purpose of the amendment was to afford protection to individuals charged with capital crimes who possessed "significantly subaverage intellectual functioning as evidenced by an intelligence quotient of 70 or below ... and impairment in adaptive behavior," where such "mental retardation is manifested before the individual attains

---

35. Respondents correctly note that the record does not exhaustively document the extent of Wiggins's mental limitations. The social services records do not fully reveal the extent of his mental retardation, nor the testing and other criteria used to support any such conclusions.

36. The *Penry* Court noted the Maryland amendment in its opinion. At that time, only Georgia and Maryland had codified prohibitions against the execution of the mentally retarded.

the age of 22." *See* Art. 27, § 412(f)(3). The maximum penalty for first degree murder committed by a mentally retarded defendant under the statute no longer was death, but rather life imprisonment or, upon proper notice, life imprisonment without the possibility of parole. *Id.*, §§ 412(g)(1) and (2).

 The Eighth Amendment categorically prohibits the infliction of cruel and unusual punishments. Since its enactment in 1789, those prohibitions have expanded, in conjunction with the "evolving standards of decency that mark the progress of a maturing society." *See Ford v. Wainwright*, 477 U.S. 399, 406, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). While the Supreme Court has not held that execution of the mentally retarded violates our "evolving standards of decency," [37] it has required the presentation of such information in mitigation at the sentencing phase of capital trials. Clearly, the information contained in the DSS records indicated that Wiggins might be mentally retarded. If full investigation revealed mental retardation, counsel, under the case law existing at that time, was required to (1) argue that the statute barred imposition of the death penalty against Wiggins, and (2) if unsuccessful there, argue Wiggins's mental retardation as a mitigating factor to be considered by the sentencing jury. The fact that counsel at sentencing failed to investigate this possibility is but another element demonstrat-

ing that Wiggins received ineffective assistance of counsel at the sentencing phase.

### Arbitrary Application of the Death Penalty (Claim P)

Wiggins also argues that the death penalty as applied across the various Maryland jurisdictions is arbitrarily and disproportionately applied, and that it was unfairly applied to him despite the State's weak case involving circumstantial evidence; his lack of prior criminal record; and his low IQ. Respondents urge this Court to find Wiggins's "proportionality" claim procedurally defaulted or, alternatively, to find the claim is not cognizable under 28 U.S.C. § 2254(a).

In *Furman v. Georgia*,[38] the Supreme Court concluded that the death penalty was imposed in such a discriminatory,[39] wanton, freakish[40] and infrequent manner,[41] that any death sentence imposed by a State constituted cruel and unusual punishment. Since that time, "proportionality" has been used with reference to an abstract evaluation of the appropriateness of a sentence for a particular crime. The Supreme Court has examined "the gravity of [an] offense and the severity of the penalty, to sentences imposed for other crimes, and to sentencing practices in other jurisdictions," and at times has struck down punishments as inherently disproportionate—and therefore cruel and unusual—when imposed for a particular crime or category of crime.[42] *Pulley v.*

---

37. Whether it may do so in the near future, in light of comments made by several of the justices, remains to be seen. *Certiorari* is pending in a capital case involving a mentally retarded defendant. *See Skipper v. Lee*, 238 F.3d 414, 2000 WL 1853330 (4th Cir.2000).

38. 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

39. 408 U.S. at 240, 92 S.Ct. 2726.

40. *Id.* at 306, 92 S.Ct. 2726.

41. *Id.* at 310, 92 S.Ct. 2726.

42. *See, e.g., Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)(striking down sentence of life without parole for fourth conviction for relatively minor felonies); *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)(striking down capital sentence for defendant who aid-

*Harris*, 465 U.S. 37, 42–43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

In response to *Furman*, many states revised their capital sentencing statutes,[43] while others merely revised their capital sentencing procedures. Such revisions by and large attempted to limit jury discretion and avoid arbitrary and inconsistent results. Many states, including Maryland, devised schemes that required courts reviewing capital sentences determine whether, considering both the crime and the defendant, such sentences were disproportionate to sentences imposed in similar cases.[44] Although these proportionality safeguards were created by the states in response to *Furman*, the Supreme Court itself has never imposed a *requirement* upon the states to conduct proportionality review in capital cases.[45]

Wiggins's claim was reviewed on direct appeal, as provided by statute.[46] (*See* Paper No. 3, Exhibit 26 at 13; 324 Md. 551, 580–82, 597 A.2d 1359). Inasmuch as Wiggins's conviction and sentence are set aside pursuant to this Memorandum, I need not consider his proportionality claim here.

### The Death Penalty is Excessive
### (Claim Q)

 Invoking the Fifth, Sixth, Eighth and Fourteenth Amendments, Wiggins argues that "the sentence of death is in all cases excessive punishment." (*See* Paper No. 1 at 36; *see also* Paper No. 4 at 57). I note that this claim has been procedurally defaulted,[47] and in any event does not represent the law as set forth by current Supreme Court precedent.[48]

---

ed and abetted but did not commit murder during course of robbery); *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977)(striking down capital sentence for rape of adult).

43. Those revisions generally focused on mandatory appellate review of capital sentences; limitations placed on the number of crimes for which capital sentencing could be imposed; and the requirement that aggravating circumstances be present and mitigating circumstances be considered.

44. Maryland is among the states imposing this requirement pursuant to statute. In other states that have adopted such review, the appellate court examines proportionality despite the absence of a statutory requirement. In other states, no such review is undertaken, either by practice or by statute. *See Pulley*, 465 U.S. at 44, 104 S.Ct. 871.

45. *See, e.g., Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)(death sentence upheld even though state case law and statutory schemes did not provide for proportionality review); *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), *cited in Pulley*, 465 U.S. at 48–51, 104 S.Ct.

871. Indeed, the Court has held that "there can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death.'" *Zant*, 462 U.S. at 885, 103 S.Ct. 2733, *quoting Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)(plurality opinion).

46. Proportionality review in capital cases is required pursuant to Md.Code Ann., Art. 27, § 414(e)(4). Because the claim was clearly raised before the Maryland Court of Appeals on direct appeal, the procedural default doctrine does not bar its consideration here

47. Wiggins did not present this claim on direct appeal. *See* Paper No. 3, Exhibits 15, 16 and 26. Although raised at post conviction at the Circuit Court level, *id.*, Exhibit 30 at 31 and Exhibit 38 at 45–47, the claim was not preserved when Wiggins sought leave to appeal the denial of post conviction relief. *Id.*, Exhibits 44–46 and 50.

48. Since 1976, the Supreme Court has upheld imposition of the death penalty by the various states under certain circumstances. *See Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)(plurality) and its progeny.

*Ineffective Assistance of Appellate Counsel* (Claim R)

As a final argument, Wiggins complains that he received ineffective assistance of appellate counsel, because counsel failed to argue on appeal certain claims raised herein, to wit: (Claim H) inadequate voir dire of jurors; (Claim I) wrongful excusal of prospective jurors; (Claim L) improper evidentiary rulings by the sentencing court; (Claim M) improper instruction of the jury; (Claim O) imposition of capital punishment on a retarded individual; (Claim P) arbitrary application of the death penalty in Maryland; and (Claim Q) the death penalty is excessive punishment under all circumstances.

■ Respondents properly contend that appellate counsel's failure to raise Claims H, I, L, M, P and Q requires a finding that these claims are procedurally defaulted. Although Wiggins argued at post conviction that these claims should have been raised on direct appeal, he abandoned such argument when seeking leave to appeal the denial of post conviction relief. (*See* Paper No. 3, Exhibits 44 and 46). None of these claims presents a basis for relief, and petitioner cannot argue that he was prejudiced by appellate counsel's failure to articulate same on direct appeal.

■ As to Claim O, the trial record does not appear to contain adequate support for appellate counsel to have concluded that Wiggins was mentally retarded. Indeed, trial counsel failed to adequately explore the issue of Wiggins's mental development and present such information as mitigation at sentencing. Therefore, it is reasonable to conclude that appellate counsel employed appropriate strategy by not raising the issue on appeal, thus reserving the claim more appropriately for development at post conviction proceedings.

Accordingly, the instant petition for habeas corpus relief will be denied in part and granted in part, as set forth in the accompanying Order.

### *ORDER*

In accordance with the foregoing Opinion, **IT IS** this 18th day of September, 2001 by this Court hereby **ORDERED:**

1. That the above-captioned petition for habeas corpus relief, filed pursuant to 28 U.S.C. Section 2254 (Paper No. 1) **IS GRANTED** as to petitioner's claims of insufficiency of the evidence and ineffective assistance of counsel with regard to the failure to present mitigating evidence during sentencing;

2. That petitioner's claims are **OTHERWISE DENIED;**

3. That the conviction and sentence of Kevin Wiggins **ARE VACATED;**

4. That petitioner shall be **RELEASED within THIRTY (30) DAYS** unless within that time respondents advise this court that they intend to appeal this decision, in which event counsel shall contact the court to discuss the issue of the appropriate forum to consider the question of petitioner's release pending appeal;

4. That the Clerk of Court **CLOSE** this case; and

5. That the Clerk of Court **MAIL** a copy of this Order, together with the foregoing Memorandum, to petitioner; to petitioner's counsel, Donald Verrilli; and to Assistant Attorney General Ann N. Bosse.