Reversed and remanded by Supreme
Court opinion filed 6/26/03.

Petition for cert granted by Supreme
Court order filed 11/18/02.

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 01-23
(CA-99-2420-JFM)

Kevin Wiggins,

Petitioner - Appellee,

versus

Thomas R. Corcoran, etc., et al.,

Respondents - Appellants.

O R D E R

The court amends its opinion filed May 2, 2002, as follows:

On page 20, first paragraph, lines 2 and 4 -- the dates of "April 16" and "April 15" are corrected to read "September 16" and "September 15."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KEVIN WIGGINS,
 *Petitioner-Appellee,*

 v.

THOMAS R. CORCORAN, Warden,
Maryland Correctional Adjustment   No. 01-23
Center; WILLIAM W. SONDERVAN,
Commissioner of Corrections of the
State of Maryland; J. JOSEPH
CURRAN, JR.,
 *Respondents-Appellants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-99-2420-JFM)

Argued: January 24, 2002

Decided: May 2, 2002

Before WILKINSON, Chief Judge, and WIDENER and
NIEMEYER, Circuit Judges.

---

Reversed by published opinion. Judge Widener wrote the opinion.
Chief Judge Wilkinson wrote a concurring opinion. Judge Niemeyer
wrote a concurring opinion.

---

**COUNSEL**

**ARGUED:** Ann Norman Bosse, Assistant Attorney General, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL,

Baltimore, Maryland, for Appellants. Donald Beaton Verrilli, Jr., JENNER & BLOCK, L.L.C., Washington, D.C., for Appellee. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL, Baltimore, Maryland, for Appellants. Lara M. Flint, Brian P. Hauck, JENNER & BLOCK, L.L.C., Washington, D.C., for Appellee.

---

**OPINION**

WIDENER, Circuit Judge:

*Introduction*

The State of Maryland appeals from the district court's grant of Kevin Wiggins' 28 U.S.C. § 2254 petition for a writ of habeas corpus. The district court invalidated Kevin Wiggins' capital murder conviction under *Jackson v. Virginia*, 443 U.S. 307 (1979), and death sentence under *Strickland v. Washington*, 466 U.S. 668 (1984). The district court found that the Maryland Court of Appeals, although stating properly the governing principle of *Jackson v. Virginia*, applied it unreasonably in upholding Wiggins' capital murder conviction. Furthermore, the district court found that Wiggins' sentencing counsel was ineffective for failure to investigate and present a case in mitigation during sentencing in accord with *Williams v. Taylor*, 529 U.S. 362 (2000). This court has jurisdiction pursuant to 28 U.S.C. § 2253 and we reverse.

I. *Facts*

Kevin Wiggins was indicted in the Circuit Court for Baltimore County, Maryland on October 20, 1988 for the capital murder and robbery of Florence Lacs. Wiggins was also indicted on charges of burglary and theft. The State filed notice of intention to seek the death penalty. Wiggins elected a trial by judge, and after four days of trial, Judge Hinkel found Wiggins guilty of the first degree murder of Florence Lacs, robbery, and two counts of theft.

The evidence adduced at trial established that, on September 17, 1988 at approximately 3:50 p.m., Florence Lacs was found dead in

her bathtub partially covered by cloudy water. She was wearing a blue skirt, white blouse, and white beads. This clothing was similar to or the same as the outfit Mrs. Lacs had worn on Thursday, September 15, 1988 when she accompanied her friend Mary Elgert to a luncheon. Mrs. Elgert testified that at the time Mrs. Lacs was wearing a blue skirt and white blouse. Mrs. Elgert also testified that Mrs. Lacs drove her home from the luncheon at about 4:00 p.m.

Elizabeth Lane, another acquaintance of Mrs. Lacs, passed by her apartment at approximately 4:00 p.m. on September 16 and noticed that her orange-red Chevrolet Chevette was not in the parking lot. A third friend, Edith Vassar, testified that she "received a phone call on Friday," September 16 and that she was "quite sure" it was Mrs. Lacs on the phone.[1] When Mrs. Lacs did not arrive at Mrs. Lane's home for a scheduled card game on September 17, Mrs. Lane became alarmed and called the police at around 2:00 p.m. She told the police that she had last seen Mrs. Lacs on September 15 and at the time Mrs. Lacs was wearing a red dress.

Upon arrival at Mrs. Lacs' apartment, the police found no evidence of forced entry, either at the doors or the windows, but that the apartment had been partially ransacked. Detective Ches testified that he found a baseball cap bearing a Ryder logo on the living room floor. Detective Ches found a wet cloth on the dining room table and a damp towel on Mrs. Lacs' bed. He further testified that he lifted several fingerprints from the inside of the entrance door, the kitchen wall, and on the bathroom doorjamb. In the bathtub, floating in the water, Detective Ches found a dark colored thread. Some kitchen cleaners and a can of Black Flag were observed on the bathroom floor. Detective Crabbs testified to the presence of two *T.V. Guides* on the coffee table in front of the sofa. One, dated September 10-16, had been marked in pen through September 15 and had a bookmark inserted in the pages for that date. The other copy, dated September 17-23, was unmarked.

---

[1] Edith Vassar testified that after she reported this conversation to the police, she received a phone call from an unknown person who tried to convince her that her recollection of the date of the conversation with Lacs was in error.

Detective Butt analyzed the fingerprints taken from the crime scene. He identified two of them as coming from two of the officers at the scene, but the other prints did not match Wiggins or Mrs. Lacs. Furthermore, tests of the fibers and hairs from the hat and bathtub were not associated with Wiggins.

Dr. Margarita Korell, Assistant State Medical Examiner, performed an autopsy on Mrs. Lacs on the morning of September 18. Dr. Korell observed that Mrs. Lacs' lungs were bogey, that is to say contained fluid and were hyperinflated, a sign of drowning. Additionally, Dr. Korell testified that she observed trauma on the left hand (bruise) and an area of bleeding in the muscle that covers the thyroid cartilage. She testified that these latter injuries were caused by "some external force" consistent with a struggle prior to the victim's death. From this, Dr. Korell concluded that Mrs. Lacs was murdered. However, Dr. Korell could not determine the maximum period Mrs. Lacs had been dead to any degree of medical certainty.

Chianti Thomas, a 12-year old resident of Mrs. Lacs' building, testified that on September 15, at some time between 4:30 and 5:00 p.m., she was visiting with Chantell Greenwood and Shanita Patterson at an apartment near Mrs. Lacs' apartment. When they left the apartment, Miss Patterson had trouble locking the door, and she sought Mrs. Lacs' assistance. A man approached and offered to help. Miss Thomas testified that, at between 5:00 and 5:30 p.m., she heard this man thank Mrs. Lacs for watching some sheetrock for him. Miss Thomas identified this man as Wiggins from a pre-trial photographic lineup. However, she was unable to identify Wiggins in court. Finally, Miss Thomas testified that after the conversation with Mrs. Lacs, Wiggins left.

Robert Weinberg, Wiggins' employer and construction contractor, was working at Mrs. Lacs' building at the time of her death. Weinberg testified that on September 14, Mrs. Lacs called out to Wiggins from her window expressing concern that a work truck might block her car. Weinberg assured her that the truck would not block her car. Weinberg testified that on September 15 he released Wiggins from work between 4:00 and 4:30 p.m., but that about 30 minutes later, Wiggins came back and told him that he had moved some sheetrock, a service Weinberg had not requested. Weinberg stated that this

4

action would have taken only about 1-1/2 to 2 minutes, and that, although Wiggins reported for work on September 16, he left early because he said he was being evicted on that day.

Geraldine Armstrong, Wiggins' girlfriend, testified that Wiggins came to pick her up on September 15 in Mrs. Lacs' Chevette at around 7:45 p.m. After having an altercation resulting in Miss Armstrong's brother brandishing a handgun at Wiggins, Wiggins and Miss Armstrong went shopping using the victim's credit cards. They went shopping again the next day in Mrs. Lacs' Chevette, purchasing a diamond ring at J.C. Penny's on Mrs. Lacs' credit card. On September 17th, they pawned a ring belonging to Mrs. Lacs. Miss Armstrong testified that Wiggins told her that he had found the car and that the credit cards belonged to his aunt.

On September 21, the police spotted Wiggins and Geraldine Armstrong driving Mrs. Lacs' Chevette. The Maryland Court of Appeals found that Wiggins made a statement to the police that Miss Armstrong "didn't have anything to do with this," and that he found Mrs. Lacs' car with the keys in it in a restaurant parking lot on September 16. According to that statement, the credit cards were in a bag on the floor, and Mrs. Lacs' ring was on the floor of the car. Wiggins was arrested and the police found a rubber glove in his pocket. A piece of this glove was tested for residual traces of the cleaners found in Mrs. Lacs' apartment. None were found. Wiggins admitted to using the credit cards and pawning the ring.

The State endeavored to prove that Wiggins admitted murdering Mrs. Lacs by offering the testimony of two inmates who were incarcerated along with Wiggins. The first inmate, John McElroy, testified that Wiggins told him that he hit Mrs. Lacs in the head with a bat, put her in the bathtub, and made off with $15,000 from her home. On cross examination, Wiggins' counsel elicited testimony that McElroy had a long history of PCP use and was currently prescribed to take Elavil, a mood altering drug.

The second inmate, Christopher Turner, testified that Wiggins told him that he had stolen Mrs. Lacs' car, beaten and kicked her, then drowned her in the bathtub with lye or some other chemical in the water. Turner testified that Wiggins admitted to him that he had stolen

5

the car, taken Mrs. Lacs' credit cards, money, and a ring from her finger, that he had used the credit cards to buy clothes and jewelry, and that he let his girlfriend use the credit cards. On cross examination, Wiggins' counsel elicited testimony that Mr. Turner had a long history of exchanging information to law enforcement for leniency, was suffering from active psychosis, and had entered into an agreement to limit sentencing on pending matters in exchange for his testimony.

The defense called an expert in forensic pathology, Dr. Gregory Kauffman, to challenge the State's theory of the cause of death (drowning) and also to establish that at the time of discovery and photography of the body on September 17, Mrs. Lacs had been dead no more than 18 hours. Dr. Kauffman asserted that drowning was unlikely because there were no signs of a struggle, but agreed that the death was a homicide. Finally, he testified that, within a reasonable degree of medical certainty, Mrs. Lacs' time of death was no earlier than 3 a.m. on Saturday, September 17.

At the close of the case, Judge Hinkel found Wiggins guilty of the murder of Mrs. Lacs, robbery, and theft. In his ruling, Judge Hinkel indicated that he did not believe either McElroy or Turner. He found that Wiggins was at Mrs. Lacs' apartment building "at a relevant time", that Mrs. Lacs died sometime on Thursday, September 15, and not any later. The judge also believed to be due to mistaken memory the evidence that Edith Vassar gave regarding the telephone call on the 16th and Elizabeth Lane's missing person's report, indicating that Mrs. Lacs was wearing a red dress on the 15th. In closing, the judge remarked, "[t]he defense argues that any presumption that he is the robber is rebutted by the testimony of Miss Vassar, but my decision is not based on any presumption arising from the recent possession of stolen property, but my belief and fact finding and decision is based upon all the evidence that I have weighed in this case and not by any presumption."

Wiggins chose a jury for sentencing. Instead of developing a case in mitigation based on Wiggins' social history, defense counsel chose to question the essential fact that Wiggins was not the actual killer.[2]

---

[2] Under the Maryland statutory scheme, the proof concerning guilt required at a capital sentencing hearing is different from the proof

Defense counsel conceded that Wiggins had indeed been convicted of murder, but implored the jury that it might be "at least reasonably possible, if not highly probable, that Florence Lacs died at the hands of someone other than Kevin Wiggins," and therefore, Wiggins was not a principal in the first degree, eliminating his eligibility for the death penalty. The defense introduced no mitigating evidence other than the stipulated statutory mitigating factor that Wiggins had no prior violent convictions. The jury sentenced Wiggins to death. The Maryland Court of Appeals affirmed the conviction and sentence, the sentence by a divided court. *Wiggins v. State*, 597 A.2d 1359, 1367 (Md. 1991).

Wiggins applied for state post-conviction relief, alleging that the failure to make out a case in mitigation based on his social history constituted ineffective assistance of counsel. In the state proceeding, Wiggins' counsel presented a social history report detailing Wiggins' history of physical, sexual, and mental abuse at the hands of his parents and guardians, and that his IQ indicated borderline mental retardation. From the bench, the court stated that Wiggins' trial counsel may have been ineffective in that they failed to have a social history prepared for mitigation, but expressed no opinion as to whether he had suffered prejudice or whether the decision was justified. However, in its formal opinion, the court found that counsel had made a "tactical decision and it was reasonable." A divided Maryland Court of Appeals affirmed. *Wiggins v. State*, 724 A.2d 1, 17 (Md. 1999).

Wiggins filed a timely 28 U.S.C. § 2254 petition in the district court. The district court found that the Maryland Court of Appeals had unreasonably applied the standard articulated in *Jackson v. Vir-*

---

required at the guilt or innocence stage of the trial. At the guilt or innocence stage, the State must prove beyond a reasonable doubt that the defendant is guilty of first degree murder. However, at the sentencing stage, the State must show beyond a reasonable doubt that the defendant was the actual perpetrator of the murder. In other words, under Maryland law, he must be a principal in the first degree. See Md. Code Art. 27, § 413(e)(1); Md. Rule 4-343(3). "[T]he jury [at sentencing] still is required to make its own determination, unanimously and beyond a reasonable doubt, that appellant was the actual killer." *Wiggins v. State*, 724 A.2d 1, 15 (Md. 1999).

*ginia*, 443 U.S. 307 (1979), pertaining to sufficiency of the evidence challenges when it affirmed his convictions. See *Wiggins v. Corcoran*, 164 F. Supp. 2d 538, 554 (D. Md. 2001). Additionally, the district court found that Wiggins' counsel did not render effective assistance at sentencing. The district court based its decision in large part on the Supreme Court's recent decision in *Williams v. Taylor*, 529 U.S. 362 (2000), finding counsel ineffective for failure to investigate and present at sentencing his client's social history. The district court reasoned that "Wiggins's evidence was much stronger, and the State's evidence favoring imposition of the death penalty was far weaker, than the comparable evidence in *Williams* ," and concluded that Wiggins was entitled to relief. *Wiggins v. Corcoran*, 164 F. Supp. 2d at 557-60. The district court explicitly found that Wiggins' case could not be distinguished on the ground that trial counsel had made a legitimate tactical decision because it found that a tactical decision to be reasonable must be based on a reasonable investigation which was not performed. *Wiggins*, 164 F. Supp. 2d at 558-59. The district court granted the petition, vacated the conviction and sentence, and ordered Wiggins released from the murder charge. 164 F. Supp. 2d at 576. However, the district court stayed its judgment pending our resolution of the State's appeal.

## II. *Standard of Review*

As a result of the Antiterrorism and Effective Death Penalty Act's amendments to § 2254, our review of state criminal convictions is circumscribed. A federal court may only grant relief under § 2254 if it is shown that a decision of a state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as established by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently from [the Supreme] Court on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). The "unreasonable application" grounds for granting the writ applies "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 412-13. See also *Bell*

*v. Jarvis*, 236 F.3d 149, 157 (4th Cir. 2000) (en banc). However, a writ of habeas corpus may not issue if the federal court, in its own judgment, decides that the state court decision applied clearly established federal law merely "erroneously or incorrectly." *Vick v. Williams*, 233 F.3d 213, 216 (4th Cir. 2000) (citation omitted). Instead, we must decide if the state court's application of federal law was objectively unreasonable. 233 F.3d at 216. We have said that the criterion of reasonableness for purposes of § 2254(d)(1) is "whether the [state court's] determination is at least minimally consistent with the facts and circumstances of the case." *Bell v. Jarvis*, 236 F.3d at 159 (quoting *Wright v. Angelone*, 151 F.3d 151, 157 (4th Cir. 1998) (citation omitted)).

Both of Wiggins' contentions here implicate the "unreasonable application" ground for relief under § 2254(d)(1) because the Maryland Court of Appeals identified the correct principles governing Wiggins' claims from Supreme Court precedent. We review *de novo* the district court's decision on a § 2254 petition based on a state court record. *Spicer v. Roxbury Correctional Institute*, 194 F.3d 547, 555 (4th Cir. 1999). Therefore, we must decide for ourselves whether the Maryland Court of Appeals unreasonably applied clearly established federal law as determined by the Supreme Court.

III. *Wiggins'* Jackson v. Virginia *Claim*[3]

---

[3] Although *Jackson* announced the appropriate standard for sufficiency of the evidence review in habeas corpus cases, the Maryland court of appeals found it applicable to direct appeals in *Tichnell v. State*, 415 A.2d 830, 842 (Md. 1980), and subsequently applied it on direct appeal of Wiggins' conviction. This is the same method of analysis utilized by the Supreme Court in *United States v. Powell*, 469 U.S. 57, 67 (1984), a case on direct appeal. There the Court equated the "substantial evidence" standard of *Glasser v. United States*, 315 U.S. 60 (1942), also a direct appeal case, with *Jackson*'s rationality test. See *United States v. Powell*, 469 U.S. 57, 67 (1984) ("Sufficiency-of-the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt.") (citing *Glasser v. United States*, 315 U.S. 60 (1942), and *Jackson v. Virginia*, 443 U.S. 307 (1979)).

9

In *Jackson v. Virginia*, the Supreme Court stated that the "critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . [is] whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The question to be answered in applying the standard is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (italics in original). Conflicting inferences presented by the facts in the historical record are presumed to have been resolved in favor of the prosecution "even if it does not affirmatively appear in the record", and we must defer to that resolution." *Jackson*, 443 U.S. at 326; *Wright v. West*, 505 U.S. 277, 297 (1992). The Maryland Court of Appeals identified these controlling principles of law correctly. *Wiggins v. State*, 597 A.2d at 1366-67. As stated above, it is our task to decide whether the state court's application of these precepts is unreasonable in this case: to do this we must decide whether the Court of Appeals' decision is minimally consistent with the historical record of facts. *Bell v. Jarvis*, 236 F.3d at 159. We conclude that it is; indeed, in our opinion, it is not only minimally consistent with, but fully supported by the record.

In deciding Wiggins' sufficiency claim on direct appeal, the Maryland Court of Appeals reviewed the trial court's findings of fact for clear error pursuant to state law and concluded that no such error was present. The Court stated that the trial judge "considered but rejected Wiggins's argument that the circumstances taken together, demonstrated a reasonable hypothesis of innocence." *Wiggins v. State*, 597 A.2d at 1367.[4] Furthermore, the Court of Appeals concluded that the trial judge explicitly "did not credit any of Wiggins's evidence that the robbery and murder were committed at a time subsequent to his theft of the victim's car and other personal property." 597 A.2d at 1367. Lastly, the Court stated that the conflicting testimony regarding time of death did not render the trial court's ultimate conclusion of guilt clearly erroneous. As such, the Maryland Court of Appeals found that there was sufficient evidence for a rational trier of fact to

---

[4] The Maryland rule which the trial judge considered in this case is more favorable to defendants than the federal rule. Compare *Wilson v. State*, 573 A.2d 831, 834 (Md. 1990), with *Jackson*, 443 U.S. at 320.

conclude, as Judge Hinkel did, that Wiggins robbed and murdered Mrs. Lacs on September 15. 597 A.2d at 1367.

A recitation of the facts found by the trial judge and the inferences that could reasonably be drawn therefrom will demonstrate that the Maryland Court of Appeals applied *Jackson* reasonably.[5] Kevin Wig-

---

[5] The district court began its *Jackson* analysis by stating that only one piece of evidence supported an inference that Wiggins murdered Lacs, namely his possession of Mrs. Lacs' property. 164 F. Supp. 2d at 554. However, the court stated that Wiggins' conviction could not be sustained on that basis, because the trial judge had refused to draw that very inference. Stating that the Maryland Court of Appeals appeared to rely on that inference to affirm, the district court reasoned that it would be a violation of due process "for an appellate court, in affirming a conviction, to rely upon an inference that is only permissible and that was expressly rejected by the finder of fact." Accordingly, the district court proceeded to examine the record facts for other evidence of guilt, finding none. The district court, however, misapprehended the finding of the Maryland trial court and also the decision of the Maryland Court of Appeals. To repeat, what Judge Hinkel decided with respect to the recently stolen property follows:

> The defendant of course is in possession of recently stolen property. The defense argues that any presumption that he is the robber is rebutted upon testimony of M. S. Vassar, but my decision is not based on any presumption arising from the recent possession of stolen property, but my belief and fact finding and decision is based upon all the evidence that I have weighed in this case and not by any presumption. [J.A.550]

So the district court found that the Maryland trial court did exactly what the Maryland trial court did not do. It laid off the finding of the Maryland trial court solely to possession of Mrs. Lacs' property which had been recently stolen, the very thing that Judge Hinkel did not do, rather basing his decision on "all the evidence that I have weighed in this case and not by any presumption." Although we cannot know all the mental processes of Judge Hinkel, it may well be that he was aware of such cases as *West v. State*, 539 A.2d 231 (Md. 1988), in which the recent possession of a stolen money order after a purse snatching sufficed to support the crime of receiver but not stealing the money order. However that may be, and whatever the presumption may be in Maryland, Judge Hinkel did not rely on it, rather, as noted, he relied on "all

11

gins was working in Lacs' building on September 15, 1988. Wiggins was dismissed from work at or about 4:30 p.m. on that day. Wiggins had no legitimate reason to stay at work after the time his supervisor dismissed him, however, he returned to the building sometime after 4:30 p.m. While in the building, Wiggins was seen near Mrs. Lacs' apartment by Chianti Thomas, who also testified that Wiggins and Mrs. Lacs briefly conversed. When Wiggins returned from the building some 30 minutes later, he told his supervisor that he moved some sheetrock in the apartment building. This job, according to Wiggins' supervisor, would only have taken "a couple of minutes." Later that same night, Wiggins was found in possession of Mrs. Lacs' credit cards, her ring, and her car. There was evidence that Wiggins' girlfriend, who came with him that evening of September 15th, forged Mrs. Lacs' name to the credit card slips, while accompanied by Wiggins. The trial court could reasonably have drawn several inferences from these facts, that Wiggins was in the vicinity of Ms. Lacs' apartment sometime around 5:00 p.m. on the evening of September 15th, that he had ample time to steal Mrs. Lacs' property, approximately 30 minutes, and that his return to explain his presence on the job site was pre-textual.

The time of death was not established to a reasonable medical certainty by medical testimony at trial. In fact, the conclusions of the

---

the evidence that I have weighed in this case and not by any presumption." Judge Hinkel's trial decision as to consideration of the evidence was consistent with the direction in *Jackson* as to the review of evidence, that:

> the factfinder's role as weigher of the evidence is preserved through a conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. 443 U.S. at 319 (italics in original).

And this quotation from *Jackson* was more recently repeated in *Wright v. West*, 505 U.S. 277, 296 (1992). The fact that the Maryland trial court did not rely on any presumption, in our opinion, did not prevent that court from its reliance on all of the evidence in the case, which included, among many other items, the fact that Mrs. Lacs' automobile, credit cards, and ring had been stolen at a time contemporaneous with her murder and that Wiggins was present at her house at that time.

12

medical experts were discounted by the trial judge. However, that the time of death was not established to any scientific certainty is of little moment because ample evidence supported the conclusion that Mrs. Lacs was killed on the evening of September 15, thus implicating Wiggins in more than mere theft or robbery. First, there was the testimony of Mrs. Lacs' friends regarding her attire the last time she was seen alive. The testimony established that Mrs. Lacs was wearing a blue skirt, white blouse, and white beads when she was seen at her regular card game on the 15th. This was the same outfit that she was wearing when she was found dead on the 17th.[6] Furthermore, there was evidence that Mrs. Lacs had marked certain television programs of apparent interest in her *TV Guide*, and the last markings in the *TV Guide* were for September 15. As stated above, other testimony established that Mrs. Lacs was last perceived alive[7] on September 15, sometime between 4:00 and 5:00 p.m. when Chianti Thomas heard Wiggins thank Mrs. Lacs for watching some sheetrock for him. It was only a few hours later that Wiggins picked up Miss Armstrong in Mrs. Lacs' car and the two began using Mrs. Lacs' credit cards. Adding all the circumstances together, the trial judge concluded that Florence Lacs' robbery and murder occurred on the evening of September 15th and that Wiggins, being there at "a relevant time," was the robber and murderer. On this basis, the Maryland Court of Appeals found *Jackson v. Virginia* satisfied. We are of opinion and decide that the Maryland Court of Appeals' decision was not only at least minimally consistent with the record of facts found by the trial judge and thus was not unreasonable within the meaning of § 2254(d),

---

[6] This testimony was not without contradiction. Mary Elgert filed a missing persons report indicating that Mrs. Lacs was wearing a white blouse and red skirt when she was last seen on Thursday. The trial judge explicitly resolved the conflicting testimony in favor of the prosecution stating that Mrs. Elgert's recollection was simply wrong. It is the exclusive province of the trier of fact, save only for clear error, to resolve conflicting facts and credibility determinations at trial. The Maryland Court of Appeals reviewed the record evidence for clear error and found none. Nor is there any evidence that we can see that would indicate a result to the contrary.

[7] Edith Vassar testified that she received a call from Florence Lacs on the morning of September 16. The trial judge explicitly found that Mrs. Vassar did not correctly remember.

13

it was fully supported by the record. Accordingly, we reverse the district court's grant of Wiggins' petition on this issue.

## IV. *Wiggins'* Strickland *Claim*

We review Wiggins' claim *de novo* applying the same standard prescribed by § 2254(d) and find that the Maryland court's decision was a reasonable application of *Strickland*. *Strickland v. Washington*, 466 U.S. 668 (1984), establishes a two component, conjunctive test for ineffectiveness of counsel claims; namely that counsel's performance was deficient and that such performance prejudiced the defense. To establish deficient performance the defendant must show that counsel's performance fell below an objective standard of reasonableness. 466 U.S. at 687. The reasonableness inquiry proceeds based on all of the facts and circumstances of the case "viewed as of the time of counsel's conduct." 466 U.S. 690. This performance prong is highly deferential to counsel's choices, and informed strategic decisions are virtually unchallengeable. 466 U.S. at 690. A defendant "must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" 466 U.S. at 489 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). To establish prejudice, the defendant must show that but for counsel's deficient performance "there is a reasonable probability that . . . the result of the proceeding would have been different." 466 U.S. at 688. A reasonable probability is one "sufficient to undermine confidence in the outcome of the proceeding." 466 U.S. at 694. The Maryland Court of Appeals analyzed Wiggins' ineffectiveness claim under this standard. *Wiggins v. State*, 724 A.2d 1, 12 (Md. 1999).

The district court found that Wiggins did not receive effective assistance of counsel at sentencing because his counsel failed to develop a social history exposing Wiggins' harsh childhood and sub-average mental capacity.[8] The district court decided that the Court of Appeals was unreasonable in its analysis of Wiggins' claim because it was purportedly "almost directly contrary to the Supreme Court's recent decision in *Williams v. Taylor*." *Wiggins v. Corcoran*, 164 F. Supp. 2d at 557 (citation omitted). Upon its independent review of the

---

[8] The district court did *not* find counsel ineffective with respect to the conviction, only as to the sentencing.

14

claim, the district court found for Wiggins on the claim and thus granted his § 2254 petition on this aspect of the petition, as well as that the evidence did not support the judgment of conviction.

In *Williams v. Taylor*, counsel began preparing for sentencing one week before the proceeding and failed utterly to prepare any social history because of a misapprehension of state law regarding access to juvenile records. *Williams*, 529 U.S. at 395. That social history would have disclosed a wealth of potentially mitigating evidence grounded in Williams' "nightmarish" childhood, as well as his being "borderline mentally retarded." In other words, counsel's complete failure to investigate could not have led to a reasonable strategic choice for the simple reason that he had no information upon which to make a strategic choice. It was this wholesale failure that led the Court to conclude that Williams did not receive constitutionally sufficient representation. *Williams*, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)).

We think that despite any superficial similarities to the instant case, the district court's reliance on *Williams v. Taylor* to find the Maryland Court of Appeals' decision unreasonable was misplaced. First, *Williams* does not establish a *per se* rule that counsel must develop and present an exhaustive social history in order to effectively represent a client in a capital murder case. It merely reaffirms the long settled rule, in the context of a particularly glaring failure of counsel's duty to investigate, that defendants have a constitutional right to provide a factfinder with relevant mitigating evidence. *Williams*, 529 U.S. at 393; see also, e.g., *Penry v. Lynaugh*, 492 U.S. 302, 327-28 (1989). *Williams* does require that counsel have some knowledge about potential avenues of mitigation on behalf of a client in order to make a decision that can be fairly characterized as a reasonable strategic choice. This, however, has always been the rule under *Strickland*, and the particular quantum of knowledge required depends on the facts and circumstances of each particular case. See *Strickland*, 466 U.S. at 691. Secondly, even if *Williams* did establish such a *per se* rule, it would not have been "clearly established" within the meaning of § 2254, as the *Williams* case was decided more than a year after the Maryland Court of Appeals' decision here. See *Booth-El v. Nuth*, No. 01-8, slip 7-8, ___ F.3d ___ (4th Cir. 2002). Finally, despite the district court's contention to the contrary, we are of opinion that Wig-

15

gins' counsel made a reasonable strategic decision and neither *Williams*, as it may apply here, nor any of *Strickland*'s other progeny, require a different conclusion.

Wiggins' sentencing counsel, Mr. Schlaich, did know about Wiggins' difficult childhood, as the district court acknowledged. *Wiggins v. Corcoran*, 164 F. Supp. 2d at 559. During the evidentiary hearing in the Maryland courts, Mr. Schlaich stated that he knew of some of the details of Wiggins' childhood as they existed in the presentence investigation report and social services records which he had seen. He knew, for example, that Wiggins had been removed from his natural mother as a result of a finding of neglect and abuse; that there were reports of sexual abuse at one of his foster homes; that he had had his hands burned as a child as a result of his mother's abuse; that there had been homosexual overtures made toward him by a job corps supervisor; and that he was borderline mentally retarded. So any inference that his knowledge and investigation was merely casual or offhand is simply not so. Although further investigation would have developed more extensive details of Wiggins' childhood, the extant records did inform Schlaich of a possible avenue of mitigation. The district court concluded, however, that the knowledge Schlaich gained through these reports put him on notice and required him to inquire further. This was error. When considering claims of ineffectiveness, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Chronic*, 466 U.S. 648, 665, n. 38 (1984)). In this connection, the Supreme Court has indicated that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support limitations on investigation." *Burger v. Kemp*, 483 U.S. at 794. The Maryland Court of Appeals determined that Schlaich's knowledge of potential mitigation avenues was sufficient to make an informed strategic choice. We think that the Maryland Court of Appeals' decision in this regard was reasonable.

The attorneys viewed the case against Wiggins at the guilt phase to be quite flimsy. Furthermore, because of the conflicting medical testimony as to time of death, the lack of direct physical evidence affirmatively placing Wiggins in Florence Lacs' apartment, and existence of other evidence, such as the Ryder hat found in Mrs. Lacs'

apartment, Schlaich "believed that [Wiggins'] best hope of escaping the death penalty was for one or more of the jurors to entertain a reasonable doubt as to," 724 A.2d at 15, whether Wiggins was the actual killer. Add to that the stipulated fact of Wiggins' clear record. On the other hand was Wiggins' social history. As stated above, Schlaich had knowledge of some of Wiggins' social history from the presentence investigation report and social services records and likely knew that additional development would have resulted in more sordid details surfacing. Nonetheless, Schlaich decided that social history evidence was problematic in that it tended to conflict with any attack on principalship: Counsel would present a picture to the jury of an innocent man, notwithstanding his murder conviction, and then, to the same factfinder, argue that if he was the principal, then the jury should be lenient because of his difficult childhood. Schlaich was aided by the fact that the guilt trial had not been before the jury, which was an advantage, as the Maryland Court recognized. 724 A.2d at 16-17. Alternative arguments are common in the law, but there is no authority that requires that an attorney use them. Indeed, the choice between arguments, limited, perhaps by the client's express wishes, seems to be the very essence of counsel's function in any context. Cf. *Jones v. Barnes*, 463 U.S. 745 (1983) (holding that defense counsel assigned to prosecute appeal from criminal conviction does not have constitutional duty to raise every nonfrivolous issue requested by defendant).

Finally, we note that there is nothing in *Strickland* or its progeny to suggest that even if Schlaich had investigated further that he would have been required to present the evidence thus developed in addition to, or instead of his chosen strategy. On the contrary, the Supreme Court has found it reasonable to rely on other strategies during capital sentencing proceedings notwithstanding counsel's possession of other mitigating evidence, especially where that evidence is equivocal. See *Burger v. Kemp*, 483 U.S. at 792-3 (1987) (failure to put on unhappy childhood evidence reasonable where helpfulness was in doubt); *Darden v. Wainwright*, 477 U.S. 168, 186 (1986) (counsel's failure to put on psychiatric mitigating evidence reasonable where such evidence may have opened door to prosecution to rebut with evidence of capability to commit the crime charged). The Supreme Court has held that counsel is not ineffective for failing to introduce evidence that would have hurt as much as it helped. *Darden*, 477 U.S. at 186-7; see also *Howard v. Moore*, 131 F.3d 399, 421 (4th Cir. 1997) (en banc).

17

Indeed, whether a particular bit of evidence is mitigating is often "in the eye of the beholder." *Burger v. Kemp*, 483 U.S. at 794 (citation and internal quotation marks omitted). Likewise, in this case, not all of the available social history evidence is unequivocally mitigating. Here, the jury could just as easily have viewed Wiggins' childhood and limited mental capacity as an indicator of future lawlessness. See, e.g., *Barnes v. Thompson*, 58 F.3d 971, 980-1 (4th Cir. 1995) (failure to introduce evidence of childhood abuse or mental impairment not ineffective where counsel concluded evidence could have been used by jury to make finding of future dangerousness).

As we have stated, "[t]rial counsel is too frequently placed in a no-win situation with respect to possible mitigating evidence at the sentencing phase of a capital case. The failure to put on such evidence, or the presentation of evidence which then backfires, may equally expose counsel to collateral charges of ineffectiveness. The best course for a federal habeas court is to credit plausible strategic judgments in the trial of a state case." *Bunch v. Thompson*, 949 F.2d 1354, 1364 (4th Cir. 1991). The district court failed to heed this admonition. Schlaich stated that he chose to focus on one theory of Wiggins' case at sentencing because the "shotgun approach" often confuses the issues and works to the detriment of the defendant. In Schlaich's professional judgment, then, avoidance of conflicting arguments supported limited investigation into social history. The Maryland Court of Appeals found his judgment sound on the basis of the factual record before it, and even if we were of opinion that the Maryland Court's decision was in error, we cannot say that it was unreasonable.

We are of opinion that the Maryland Court of Appeals' decision regarding Wiggins' ineffectiveness claim was reasonable.[9] Therefore, we reverse the district court's grant of Wiggins' petition on this ground also.

---

[9] Because we find that the Maryland Court of Appeals' decision regarding ineffectiveness was reasonable, we need not address the second prong in the *Strickland* analysis.

18

V.

The judgment of the district court is accordingly

*REVERSED.*

WILKINSON, Chief Judge, concurring:

I concur in the opinion of the court. Under the AEDPA standard of review, and given the parameters of the *Jackson* and *Strickland* claims themselves, our role is a circumscribed one. Judge Widener has set forth the record evidence with admirable care, and I am satisfied that there is no basis in law or fact to overturn the judgment of the Maryland state system.

My own view is that petitioner very probably committed the heinous offense for which he stands convicted. But I cannot say with certainty that he did so.* However, it is for the Governor to determine the extent to which the lack of total certitude should inform the exercise of discretion under Md. Code Ann., Corr. Servs. § 7-601 and Md. Const. art. II, § 20. To confuse the rule of law here with the role of clemency would only do a disservice to both.

NIEMEYER, Circuit Judge, concurring:

The court's opinion in this case fully states the record evidence and persuasively demonstrates why the State court did not act unreasonably in applying *Jackson v. Virginia*, 443 U.S. 307 (1979), to deny Wiggins relief on his first claim. As an additional reason for reaching this conclusion, I would note that from the condition of Florence Lacs' apartment, a reasonable jury could find, beyond a reasonable doubt, that whoever ransacked Florence Lacs' apartment and robbed her also murdered her. Because the evidence convincingly points to the fact that Wiggins robbed Lacs on April 15 and, within hours, was using the products of this robbery, the jury could reasonably find that

---

*In addition to the strong incriminating evidence, there are also the unexplained items noted by Judge Widener — namely, the unidentified fingerprints, baseball cap, fibers, and hairs. Further, the petitioner had no prior record.

19

Wiggins also murdered Lacs. Wiggins' only explanation — that he found Lacs' Chevrolet *on September 16* with the keys, credit cards, and a diamond ring in it — is belied by the fact that Wiggins is directly linked to the car and the credit cards during the evening of *September 15*.

I find the question of whether the State court reasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), to conclude that Wiggins received adequate assistance of counsel during the sentencing phase of his trial to be a closer call. Both of my colleagues are satisfied that the decision not to introduce mitigating evidence was consistent with a strategic decision made by Wiggins' counsel not to imply any confession of guilt and to seek to have the jury hesitate on the death sentence because of a hoped-for hesitation on liability. It appears to me, however, that counsel could have had it both ways. He could have insisted on arguing liability and still have maintained that any sentence of death would be inconsistent with the mitigating circumstances of Wiggins' miserable upbringing and marginal intelligence. But in the end, this may be only a luxury of hindsight. There is support in the record from which to conclude that Wiggins' counsel's decision was a tactical one and that it was not an unreasonable strategy to pursue. With less confidence, therefore, I also concur in the court's opinion that the State court reasonably concluded that Wiggins was provided effective assistance of counsel during the sentencing phase of his trial.

In short, because the State court's refusal to grant relief was neither contrary to clearly established federal law, as determined by the Supreme Court, nor involved an unreasonable application of that law, *see* 28 U.S.C. § 2254(d)(1), I agree that Wiggins' petition should have been denied by the district court. Therefore, I concur in the thorough opinion prepared for the court by Judge Widener.

20